[639 NYS2d 784]

Francisco Merino, Respondent, v New York City Transit Authority, Appellant.

First Department, March 5, 1996

---

## APPEARANCES OF COUNSEL

*Lawrence A. Silver* of counsel (*Albert C. Cosenza,* attorney), for appellant.

*Brian J. Isaac* of counsel (*Alan M. Shapey* on the brief; *Harry H. Lipsig & Partners,* attorneys), for respondent.

## OPINION OF THE COURT

Tom, J.

Defendant New York City Transit Authority appeals a judgment, entered pursuant to a jury verdict, on the ground that plaintiff has failed to prove a prima facie case of negligence against it for injuries sustained by plaintiff who, while intoxicated, fell off a subway platform and was run over by a train. This was the second trial of the underlying action.

In 1988, plaintiff Francisco Merino found work as a dishwasher in a restaurant called "Mary Lou's" in Manhattan where, in February 1989, he began to work full time. Plaintiff worked until 3:00 A.M. on Sunday morning, April 9, 1989, returned home and, at some point later that day, although plaintiff was unsure when, he proceeded to a fried food stand, the location of which he could not remember. Plaintiff testified that he consumed "some beers" and, when questioned on how many, stated "I don't know exactly. Three, six. I don't know the exact amount."

Plaintiff thereafter left the food stand, although beyond stating it was dark, he could not specify the time. He then decided to buy bread at a restaurant but, as he started toward the establishment, he realized he had no money and proceeded to the 183rd Street Station.

Merino testified that after he reached the station platform (the Number 4 line at that point is elevated), he stood next to the stairs because he was tired and "the alcohol was having an effect on me", making him dizzy. Plaintiff stated that at no other time did he see anyone else on the platform. Merino, because of his condition, then sat down in the middle of the stairs until he saw the lights of an approaching train, whereupon he got up and approached the edge of the platform, approximately 196 feet from the point where the train enters the

station. Plaintiff testified that he then was either pushed or he fell[1] from the platform onto the tracks.

Plaintiff, who claimed he remembered nothing else after tumbling to the trackbed, was struck by the train and run over by approximately three subway cars. Dr. Mark Hirsch, an intern in the Emergency Room at Jacobi Hospital, where plaintiff was brought, testified that plaintiff, upon his arrival, smelled of alcohol, was clinically intoxicated, and appeared to be coming in and out of sleep. The hospital record described plaintiff as inebriated. Plaintiff suffered various injuries including a fractured skull, and, after microsurgery failed, the loss of his left arm.

Courtney John, a transit employee, testified that on Monday morning, April 10, 1989, he arrived by train on the northbound platform of the 183rd Street Station to relieve the token clerk on duty for a meal break at approximately 3:35 A.M. Mr. John stated that plaintiff was alone on the platform, was sitting or crouching against a wall a few feet from the stairway and appeared to be intoxicated, holding what looked like a can of beer. Plaintiff did not board the train that Mr. John got off and remained seated against the wall of the platform. Approximately 15 to 20 minutes after going into the token booth, Mr. John heard the sound of a train brake going into emergency and was informed by a passenger that a person had been hit by a train.

Motorman John Sumpter testified that he was operating a Number 4 train consisting of 10 Kawasaki R-62 model subway cars (among the newest, most modern cars in the Transit Authority fleet) on the midnight to eight shift on the night in question. The R-62 cars are each 51 feet, 4 inches in length. Mr. Sumpter stated that after negotiating an upward grade and right-hand curve, he entered the 183rd Street Station at approximately 25 miles per hour (there are no speed restrictions at that station as long as the motorman can enter the station and is able to come to a smooth safe stop at the 10-car marker). Mr. Sumpter averred that he could see clearly to the end of the station and that when approximately three cars had entered the station, he saw plaintiff alone on the platform, approximately 50 feet from the front of the train. Mr. Sumpter

---

1. Merino originally contended, as memorialized in his hospital chart, and at the first trial, that he was pushed to the track bed "by some black guys." Merino later testified that he was pushed or he fell, yet he admits that no one else was on the platform and no other witnesses reported any other individuals in the station at the time Merino was injured.

testified that plaintiff suddenly fell onto the tracks and that he immediately put the train into emergency. Once the train stopped, Mr. Sumpter called the Transit Authority command center and got out of the train to investigate, whereupon he found plaintiff between the third and fourth cars.

Mr. Sumpter stated that before he began his run, he had tested the train's brakes and headlights and found them to be working properly and that they continued to work properly at the time of the accident. Mr. Sumpter also stated that the platform lights were working and, as previously indicated, he could see the entire platform when he entered the station. Transit Authority Train Service Supervisor Michael Muro, who investigated the accident immediately after it occurred and drove the train from the scene, stated that the headlights were operating properly and that the engineer, if traveling at 25 miles per hour, was not speeding when he entered the station.

At the first trial, conducted before Justice Herbert Shapiro and a jury, plaintiff sought to establish the Transit Authority's negligence on three theories: that the Transit Authority had a higher standard of care with respect to intoxicated passengers than was required by law, as per the Transit Authority's own internal rules; that the motorman failed to use due care in operating the train; and that the Transit Authority failed to provide adequate lighting on the platform and track areas so that the motorman would have sufficient time to see a person on the tracks and stop the train.

At the conclusion of the first trial, the jury awarded plaintiff total damages in the sum of $9,349,730. The jury found that the motorman had not negligently operated the train; that plaintiff was not contributorily negligent; and that the Transit Authority was "negligent in the manner in which it supplied and maintained lighting at the station at 183rd Street" and "in the manner it acted, or failed to act, through its employees, with respect to [plaintiff] when he was observed on the platform * * * in what appeared to be an intoxicated condition."

The Transit Authority thereafter successfully moved to set aside the verdict. Justice Shapiro found that the plaintiff had failed to establish a "special relationship" between himself and the Transit Authority, or that the Transit Authority had breached its duty to "take care" of him. The court dismissed this claim on the grounds that there was no evidence that the Transit Authority's internal rule had been violated nor that its violation, if any, was the proximate cause of plaintiff's injuries.

The trial court also determined that there was barely sufficient evidence to support plaintiff's claim of inadequate lighting, but held nonetheless that a new trial was required; and that the jury's finding that plaintiff was not contributorily negligent was against the weight of the evidence as his admitted intoxication was the "cornerstone of plaintiff's case". Lastly, the trial court agreed that the damage awards were excessive.

This Court affirmed the IAS Court (*Merino v City of New York*, 183 AD2d 458) and directed a new trial "with regard to issues of whether [the Transit Authority] was negligent in lighting the accident site, whether plaintiff was also negligent and the amount of damages, if any, to be awarded". We found that defendant owed no duty to plaintiff other than that of ordinary care as no special relationship was demonstrated. This Court also found that it was error for the trial court to have permitted plaintiff to introduce a portion of an internal rule which imposed a higher standard (with regard to intoxicated passengers)[2] upon the Transit Authority than required by law and that the introduction of such evidence may have affected the jury's consideration of the comparative negligence issue.

In the second trial, both sides offered expert testimony concerning the issue of whether the Transit Authority was negligent with respect to the lighting of the 183rd Street Station. The station was designed in 1913, opened in 1916, and its lighting system was renovated in the 1920's, but has not been redesigned since. A 1959 extension to the station used the same design, which consists of two sets of lights over the above-ground canopied platform.

One set of lights, the "AC" system, is located over the northbound platform and consists of approximately 140 36-watt bulbs which are powered by Consolidated Edison. The second set, which consists of light clusters, is designed to remain on in the event of a City-wide blackout and draws its power from the "third rail", which is the "DC" system. At the time of the accident, it is uncontested that 33 of the 140 AC system bulbs were not working or had been vandalized.

Testimony also revealed that the headlights of the R-62 train are designed to provide illumination of the trackbed and to strike the rails approximately 150 feet in front of the train.

2. On the initial appeal, plaintiff argued that he was *not* intoxicated at the time of the incident, yet in his bill of particulars, and at both trials, he vigorously contended that he was, in fact, intoxicated at the time in question.

The power of the lights cannot be adjusted in order to avoid glare problems for the train's operator and to prevent the blinding of engineers of oncoming trains.

Plaintiff's expert, Nicholas Bellizzi, testified that the Transit Authority did not provide adequate lighting at the Station relying, over objection, on an internal Transit Authority "Station Planning Guide" (the Guide) for lighting in stations built, or rebuilt, after 1973. Mr. Bellizzi concluded that because the lighting in the 183rd Street Station "only provided about five foot candles of light" and that the "Transit Authority's own requirements (based on the Guide) for station platform areas [are] fifteen [foot candles]," the lighting was far below its own guidelines. Mr. Bellizzi also stated that the Transit Authority was negligent for failing to put cages around the bulbs to prevent theft (the bulbs, in any event, are reverse-threaded so they are unusable in conventional sockets); and that the position where plaintiff was found was consistent with the train having gone into emergency upon striking Merino on the tracks and not, as the motorman testified, 50 feet before hitting plaintiff.

Plaintiff also offered the previous trial testimony of John Davis, a transportation expert, who had died prior to the second trial. Mr. Davis essentially agreed with Mr. Bellizzi that the Transit Authority failed to adequately light the station.

Norman Marcus, the defense expert, offered the opinion that the position of plaintiff after the accident was fully consistent with the motorman's testimony that plaintiff fell to the trackbed when the train was approximately 50 feet away. Mr. Marcus explained that at a speed of 26 miles per hour, with a reaction time of one second, the train could not have stopped until it had passed at least 130 feet beyond plaintiff. If plaintiff was found under the fourth car (Officer Patrick Sullivan, the first New York City Transit Authority patrolman on the scene, testified that Merino was found under the third car, which further bolsters the motorman's recollection of the events), Mr. Marcus estimated the speed of the train at the time of the application of the emergency brakes to be 29 miles per hour. Mr. Marcus opined that at either 26 or 29 miles per hour, and irrespective of the lighting conditions, the train could not have stopped in time to avoid striking plaintiff.

The jury subsequently found that the Transit Authority was 76%, and plaintiff 24% responsible for the accident and awarded plaintiff a gross verdict of $3,586,055: consisting of $500,000 for past pain and suffering; $2,400,000 for future pain

and suffering, $44,000 for past loss of earnings; $620,000 for future loss of earnings, $12,055 for past medical expenses; and $10,000 for future medical expenses.

The Transit Authority moved, *inter alia*, for a mistrial, judgment notwithstanding the verdict and to set aside the verdict as excessive, which was denied by order dated July 7, 1993. Judgment for plaintiff was thereafter entered on September 14, 1993. Defendant appeals and we now reverse.

Defendant argues, *inter alia*, that pursuant to our prior decision, the sole issue as to liability to be determined in the second trial was whether the Transit Authority acted negligently in lighting the accident site and that the plaintiff has failed, under those restrictions, to establish a prima facie case.

In order to set forth a prima facie case of negligence, the plaintiff's evidence must establish (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) that such breach was a substantial cause of the resulting injury (*Akins v Glens Falls City School Dist.*, 53 NY2d 325, 333; *Solomon v City of New York*, 66 NY2d 1026, 1027; *Johnson v Grand Union Co.*, 158 AD2d 517, 518; *Febesh v Elcejay Inn Corp.*, 157 AD2d 102, 104, *lv denied* 77 NY2d 801; Prosser and Keeton, Torts § 30, at 164-165 [5th ed]).

Plaintiff's case herein relies heavily, almost exclusively, on the testimony of Mr. Bellizzi, who averred that the Transit Authority should have caged the light bulbs to prevent theft and vandalism and should have provided greater illumination at the station. The latter conclusion was premised, over repeated objection, on the Guide which was promulgated in the early 1970's, decades after the 183rd Street Station was designed and upgraded. The Guide provided for "design guidelines" and criteria (not "standards" as the plaintiff continually argues) for new stations and for modernization of old stations when such projects are undertaken. The Guide was to apply to stations built or rebuilt after its publication in 1973. Plaintiff's reliance on the Guide, however, was flawed.

The law is settled that a party is under no legal duty to upgrade a structure, which was originally built in compliance with the law, by reason of subsequent changes in specifications (*Holscher v State of New York*, 59 AD2d 224, 227, *affd* 46 NY2d 792; *see also, Schwartz v New York State Thruway Auth.*, 61 NY2d 955; *Benjamin v State of New York*, 203 AD2d 629; *Mason v State of New York*, 180 AD2d 63; *Trautman v State of New York*, 179 AD2d 635, *lv denied* 79 NY2d 758; *Rittenhouse v State of New York*, 134 AD2d 774; *Van De Bogart v State of New York*, 133 AD2d 974).

In *Benjamin v State of New York* (*supra*, at 629-630), plaintiff was injured when his car veered off a State road and struck a railroad rail marker that had been in place since the 1940's. Plaintiff averred that the State was negligent in failing to replace the existing marker with a newer, flexible marker which was designed to collapse when struck by a vehicle. The Court held, however, that: "Claimants contend that by reason of certain provisions of the New York State Highway Design Manual, adopted after the installation of the railroad rail, the State had a duty to replace the rail with a flexible marker. We disagree. * * * *Rather, a fair reading of the applicable provision of the Manual prohibits DOT from using concrete and wood posts as culvert markers subsequent to the promulgation of the Manual. It would be unreasonable indeed to interpret the aforesaid provisions as requiring DOT to seek out and remove culvert markers erected many years prior to the promulgation of the Manual*" (*supra*, at 629-630 [emphasis added]).

Pursuant to the ruling in *Benjamin*, the Transit Authority was not required to upgrade its stations with brighter illumination to meet the standards of the Transit Authority's Planning Guide which was promulgated decades after the stations were built.

Similarly, in *Schwartz v New York State Thruway Auth.* (*supra*), the plaintiff contended that the State had failed to adequately safeguard highway users by modernizing guardrails. The Court of Appeals, in affirming the dismissal of the claim, held that the "guardrail that was installed met the relevant design standards in effect at the time of its construction." (*Supra*, at 956.)

In *Rittenhouse v State of New York* (*supra*, at 776), the Court, in affirming the dismissal of the plaintiff's claim, held that "the subsequent safety guidelines [the highway in question predated the 1967 guidelines] were not applicable as a standard for measuring the State's ongoing duty to maintain older highways".

In the matter before us, plaintiff, who has the burden of proving inadequate lighting at the accident site, has provided absolutely no evidence that the platform lights in the 183rd Street Station did not meet the applicable standards at the time of their original installation; that lighting condition was inadequate at the time of the accident; or that the headlights on the Kawasaki R-62 train, which provided light to the track-bed in a manner designed to avoid glare to the train's operator as well as to the operators of oncoming trains, failed to meet

current standards. Indeed, the only evidence provided established that the station lighting was soundly designed to provide illumination during blackouts and that, to avoid theft, the individual bulbs had reverse threads rendering them useless in conventional sockets.

While this Court ordered a new trial with regard to, *inter alia*, the issue of whether the Transit Authority was negligent in lighting the accident site, at no time did the Court in its decision express an intention to exclude plaintiff's burden of proving proximate cause which is an essential element of liability in a negligence action.

In the instant matter, even if defendant was somehow negligent for failing to upgrade the platform lighting to meet its guidelines for new and rehabilitated stations, plaintiff offered absolutely no proof that, under such improved lighting, the motorman would have been able to see him on the tracks in enough time to have stopped the train before striking him. Further, contrary to the dissent's position, plaintiff failed to offer any evidence to show that the condition of the platform lights during the time of the incident, with 33 of the 140 AC system bulbs out, affected the general lighting of the station or the motorman's vision so as to substantially cause plaintiff's injuries. As a result, plaintiff has failed to establish a prima facie case in that he failed to prove that defendant breached a duty or was negligent in the manner in which it supplied lighting to the 183rd Street Station and that even if such a duty existed and had been breached, that such negligence was a proximate cause of his injuries. Since plaintiff has not made out a prima facie case, the complaint must be dismissed (*Negri v Stop & Shop,* 65 NY2d 625).

Accordingly, the judgment of the Supreme Court, Bronx County (Anita Florio, J.), which was entered on September 14, 1993, finding the Transit Authority 76% and plaintiff 24% responsible for the accident in question and awarding plaintiff a verdict of $3,586,055, is reversed, on the law, without costs, and the complaint is dismissed. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

ELLERIN, J. (dissenting). The instant action was brought to recover damages for the grievous injuries suffered by plaintiff when he was hit by a subway train after falling to the tracks in the 183rd Street IRT Station. On a prior appeal, this Court affirmed an order which had set aside a verdict in plaintiff's favor and, after dismissing the other theories of liability as-

serted at the original trial, had directed a new trial on the issues of whether defendant was negligent in lighting the accident site, whether plaintiff was also negligent and the amount of damages, if any (183 AD2d 458). Upon the retrial, the jury again found that defendant was negligent, that plaintiff's own negligence bore 24% of the responsibility for the accident and awarded substantial damages. It is that verdict which is now before us.

At the retrial, the evidence presented by plaintiff included his own testimony that he fell onto the tracks when the train was just entering the station at a point some 196 feet away from his position on the tracks, the essentially uncontested evidence that the train's stopping distance was 180 feet, the testimony of plaintiff's expert that the motorman could have stopped the train in time to avoid striking plaintiff had he been able to see him and that with adequate lighting the motorman would have been able to see the entire length of the station's trackbed upon entering the station, including someone in plaintiff's position.

The jury obviously accepted this version of the accident and rejected the testimony of the motorman to the effect that plaintiff fell when the train was already well into the station and well past the point when the train could have been stopped in time to avoid hitting plaintiff.

Since it is reasonably foreseeable that persons in a subway station will, albeit on infrequent occasion, fall or be pushed onto the tracks, a common carrier, such as defendant-appellant, may be held liable for failing to take reasonable steps to provide lighting adequate to enhance the motorman's view of the tracks so as to enable him to see and avert such contingency. Indeed, that this is a viable theory of liability was established by this Court's prior remand of the case for a new trial on precisely such theory. That remand also necessarily determined that plaintiff had established a prima facie case on the first trial (see, Talevi v Metropolitan Life Ins. Co., 10 AD2d 839; see also, Goldenberg v City of New York, 43 AD2d 861). Accordingly, if the evidence submitted by plaintiff on this trial were no less than that on the first trial, a dismissal would be inappropriate and the only alternative to affirmance would be a remand for another trial. (Talevi v Metropolitan Life Ins. Co., supra.)

In support of his position that defendant failed to provide adequate lighting in the station, plaintiff established that a large number of the lights which were present in the station were

not working on the night of the accident—i.e., some 33 of the 144 bulbs, or almost a fourth of all the lights, were inoperable—and that no effort had been made to protect these lights from vandalism or to timely replace them despite sufficient notice. Expert evidence was also offered to the effect that the simple expedient of using fluorescent lights would have avoided the theft problem and provided adequate lighting and that such lights were in general use at train stations at the time in question. The opinions of both of plaintiff's experts that the lighting was inadequate were essentially predicated upon their findings that the lighting conditions prevailing at the station at the time of the accident were not consonant with the level of lighting which a reasonably prudent common carrier of passengers would have provided under the same circumstances to avoid to the extent reasonably possible the dangers which were, or should have been, known to it.

The breach of duty issues submitted by the court to the jury, substantially in the language of the Civil Pattern Jury Instructions as requested by appellant, were whether appellant was negligent in the manner in which it supplied lighting to the train and/or station and whether it was negligent in the manner in which it maintained the lighting at the station. No exception was taken to such submission.

On this appeal, however, appellant attempts to frame the liability issue in terms of the Transit Authority manual, an argument apparently adopted by the majority as determinative. This is somewhat puzzling since the questions submitted to the jury as to whether or not appellant was negligent were in no wise predicated upon its failure to comply with any guideline contained in its manual. Nor, contrary to appellant's assertions, was that manual the basis of the opinion reached by plaintiff's witness, Nicholas Bellizzi, an expert in the field of civil and transportation engineering. The record discloses that Mr. Bellizzi, in explaining the reasons for his opinion that the lighting at the station at the time of the accident was not adequate in accordance "with good and accepted engineering principles as of April, 1989" indicated that one reason was that the existing lights provided only five footcandles of light. To illustrate the import of that level of lighting, he briefly noted that this was far below the Transit Authority's own requirements, which used 15 footcandles as a guideline. It was appellant itself who thereafter introduced the Transit Authority's "Station Planning Guidelines" into evidence, emphasizing that they applied only to stations built or upgraded after 1973

and did not apply to this station which was opened in 1916, and whose lighting system was renovated in the 1920's but had not been altered since. Significantly, however, there was no showing that the internal guidelines as to lighting contained in the manual set a standard of care higher than the minimum required by law—i.e., ordinary care commensurate with the existing circumstances (*Crosland v New York City Tr. Auth.*, 68 NY2d 165)—and, absent such a showing this Court has held that the rules "may be considered by the jury as evidence of the standard of reasonable care" (*Clarke v New York City Tr. Auth.*, 174 AD2d 268, 275, citing *Kush v City of Buffalo*, 59 NY2d 26, 31-32).

As I understand the thrust of the majority opinion, it takes the position that because this subway station was built before 1916 and its lighting system was last renovated in 1920 appellant had no obligation to adjust lighting conditions, or any other conditions at the station, so long as they met whatever legal requirements governed in 1920, although there was no showing what, in fact, those standards were. No citation is needed for the proposition that the doctrine in our jurisprudence requiring the exercise of "reasonable care under the particular circumstances" predates 1920 and goes back even further than the days of gaslight and horse-drawn carriages. The position of the majority opinion appears to be that the lighting provided in 1920, before the current advanced types of locomotives were in use, must, as a matter of law, be held to fulfill the appellant's duty as a common carrier to those who use its facilities under the conditions currently prevailing no matter how different they may be. Of course, not only does this conclusion completely ignore this Court's prior ruling, in this very case, that appellant had a duty to provide adequate lighting under the circumstances actually prevailing at the time of the accident herein, but also, in effect, eliminates any duty on the part of appellant to exercise any degree of care, reasonable or otherwise, with respect to the manner in which it continues to maintain and operate its oldest facilities so long as those stations were "originally built in compliance with the law", in this case some 80 years ago. Indeed, this position brings to mind the disparagingly cited adage that "because thus it was in the time of Henry IV, thus shall it be always".

While I agree that there was no obligation upon appellant to reconstruct or completely rebuild the station to meet the latest, state-of-the-art standards, it was, however, charged with the duty of providing adequate lighting at the station so that

its operations as a common carrier could be carried out in a reasonably safe manner to avoid foreseeable dangers to those using the facility. To require that appellant exercise the requisite care to keep its existing lighting system operational—and not permit almost a fourth of those lights to remain non-functioning—or to utilize fluorescent lighting which is in such common use, in order to provide adequate lighting in a subway station is hardly an onerous or insurmountable burden in light of the foreseeable risks in such locations, and can hardly be equated to the burden incidental to rebuilding or renovating the station. Parenthetically, it may be noted that even if the station met all statutory standards when built, that would not have insulated appellant from liability, even then, for its failure to fulfill its duty of operating the facility in a reasonably safe manner (*see, e.g., Kellman v 45 Tiemann Assocs.*, 87 NY2d 871).

Since I find that the record sufficiently supports the jury's findings both as to inadequate lighting and proximate cause, I would affirm as to the defendant's liability. However, I believe that under the facts of this case, the jury's findings as to the parties' proportionate degrees of fault are against the weight of the evidence and I would direct a new trial on that issue unless plaintiff would consent to an increase of the percentage of his responsibility to 50%.

MURPHY, P. J., and RUBIN, J., concur with TOM, J.; ELLERIN and MAZZARELLI, JJ., dissent in a separate opinion by ELLERIN, J.

Judgment, Supreme Court, Bronx County, entered September 14, 1993, reversed, on the law, without costs, and the complaint dismissed.