George LOMBARD and Lomar, Inc., Plaintiffs–Appellants,

v.

BOOZ–ALLEN & HAMILTON, INC. ("BAH"), and W. Frank Jones, Individually and as an Employee of BAH, Defendants–Appellees.

Docket No. 00–7516.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 2000.

Decided Feb. 6, 2002.

Jeffrey M. Duban, Law Offices of Jeffrey M. Duban, New York, NY, for Plaintiffs–Appellants.

Bennett H. Last, Gilbride, Tusa, Last & Spellane LLC, New York, NY, for Defendants–Appellees.

Before: NEWMAN, KEARSE, and WINTER, Circuit Judges.

WINTER, Circuit Judge.

George Lombard and his wholly-owned corporation, Lomar, Inc. (collectively "Lombard" or "he"),[1] appeal from Judge Jones' grant of summary judgment dismissing claims for the intentional interference with prospective economic advantage and for negligence.

Briefly stated, Lombard is a former senior executive of Lockheed Aeronautical Systems Company ("Lockheed"), who hoped to build and operate an aerostructures manufacturing plant in Puerto Rico. The venture was to be titled NEWCO, and Lomar was to serve as the corporate owner. Lombard sought assistance from several Puerto Rican officials, including the Administrator of the Economic Development Administration of Puerto Rico ("EDA") and the President of the Puerto Rico Industrial Development Company ("PRIDCO"). These officials appear to have expressed interest in the project and recommended that Lombard approach the Government Development Bank of Puerto Rico ("GDB") to obtain debt financing. However, GDB was skeptical and retained a consulting firm, Booz-Allen & Hamilton, Inc. ("BAH"), to do a feasibility study of the proposed loan. Concluding that the NEWCO project was risky, BAH proposed various changes in the financial structure of the venture that Lombard was either unwilling or unable to make. GDB thereafter turned down Lombard's loan application. Lombard was unable to obtain financing elsewhere, and the NEWCO venture never got off the ground.

Lombard then brought the present action, seeking over $100 million in damages. The issues on this appeal involve claims against BAH and its employee W. Frank Jones for intentionally interfering with Lombard's business relationship with EDA, PRIDCO, and GDB, and, alternatively, for negligently preparing the feasibility study. We hold that Lombard did not meet his burden of proffering evidence sufficient to create a genuine issue of material fact on his intentional interference claim. We also hold that, under New York law, a loan applicant may not recover for negligence by a consulting firm retained by a potential lender to review the merits of a loan application. We therefore affirm.

## BACKGROUND

We of course view the record in the light most favorable to Lombard, who is appealing from an adverse grant of summary judgment. *See Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990) ("We assess the record in the light most favorable to the non-movant and we draw all reasonable inferences in its favor.").

In 1991, Lombard, then a Vice President of Lockheed, conducted a feasibility study regarding the establishment of a Lockheed aerostructures manufacturing plant at a facility in Puerto Rico. The study recommended such a venture, but Lockheed decided not to proceed, apparently for reasons unrelated to profitability. However, authorities at EDA were hoping to attract such a business to Puerto Rico and entered into discussions with Lombard regarding his undertaking the project. To that end, Lombard quit his job at Lock-

---

1. In the complaint, the claims for relief in contention on this appeal appear to seek damages to be awarded only to Lombard personally. Issues as to the ability of a shareholder to recover for damages to a corporation may therefore lurk in the background. However, they are not raised by the appellee and appear to be of a fixable nature. Accordingly, we will not probe into them.

heed after obtaining the rights to the Lockheed feasibility study. Lombard appears to have expected to secure a long-term contract with EDA, but EDA refused to offer more than transitional funds and a short-term consulting contract, which a disappointed Lombard accepted. PRIDCO also may have agreed to lease an available facility should NEWCO get under way.

Needless to say, the management and financial plan for NEWCO had to be altered once Lockheed declined to participate. Absent Lockheed management, Lombard would serve as the venture's founder and chief executive, although his twenty-five years of aircraft manufacturing experience did not include the running of a company. Also, financing would not be provided by Lockheed. Lombard's financing plan, which is at the heart of the present dispute, required $22–25 million in capital. Of that total, $17 million was to be raised through an unsecured, fully upfront bank loan. The remaining $5–8 million was to be raised through sales of common shares to a number of outside investors, but only after the $17 million loan had been secured.[2] The outside investors would hold 49% of the shares. A controlling bloc of 51% of the common shares would be held by Lombard and other senior executives of the NEWCO project, who would make no financial investment of their own. Lombard's business plan anticipated five years of operation, after which the venture would be sold at a price of $225 million—a 2600% to 4160% return to the equity—according to Lombard's "conservative" estimate.

The plan appears not to have attracted private lenders with regard to the $17 million loan, and the venture's supporters at EDA and PRIDCO suggested that Lombard take it to GDB, an agency of the Puerto Rican government that provides loans to projects helpful to the Commonwealth's economic development. GDB's initial reaction was negative. It had previously made loans to other aerospace manufacturers to use the same PRIDCO facility proposed for NEWCO, but they had defaulted, causing GDB to lose $40 million. Furthermore, GDB did not share Lombard's optimism about the general state of the pertinent market or NEWCO's ability to capture a large percentage of that market. Finally, GDB's President noted that the proposed financing structure, with little equity or collateral, ensured that GDB would bear most of the downside risk without any of the potential upside benefits.

Nevertheless, GDB did not reject the loan application outright but suggested that a third-party acceptable to the GDB evaluate the proposal, the cost of the study to be paid by Lombard. When Lombard declined to fund such a study, GDB retained BAH, with which the Puerto Rican government had dealt in the past. GDB paid half the costs of the study; another half was paid by EDA from the incentives fund set up for the venture. (Lombard does not argue that BAH has breached a contractual duty owed to him. Instead, as detailed *infra*, he argues that he has a "near-privity" relationship with BAH, permitting him to sue BAH for negligence.)

Lombard claims that GDB's retaining of BAH was a collusive arrangement, designed solely to echo GDB's existing skepticism towards the loan application. Lombard does not claim that GDB had any legal obligation to make the requested loan

---

2. The parties refer to the remaining amount to be raised as $5–7 million in their briefs. However, our calculations based on the total amount of capital that the parties maintain was required for NEWCO indicate that the remaining amount, subtracting the $17 million loan, should be $5–8 million.

or even to provide a reason to decline to do so. However, he insists that a pretext was necessary for Puerto Rican political reasons. He has not, however, produced any evidence to support this allegation, apart from his own speculation, and there is no evidence that the relationship between GDB and BAH was anything but arms-length. Lombard also claims that a prior but favorable feasibility study was surreptitiously concealed or destroyed by high officials at GDB. Again, apart from his speculation, there is no evidence of any such study, and a senior executive of GDB testified that no such study ever existed. Even viewing the evidence in the light most favorable to Lombard, therefore, we cannot credit his claims of a collusive arrangement between GDB and BAH or of the existence of a prior favorable study.

The BAH report was supervised by appellee Jones. It depicted NEWCO as a risky project but did not recommend an outright rejection of the NEWCO loan. Rather, it recommended modifications of NEWCO's financial plan including: (i) spreading the loan, and risk, among a syndication of lenders; and (ii) requiring a substantial equity investment by management, or, absent such a management investment, staging GDB's loan as series of smaller loans, thereby allowing the lender(s) to monitor NEWCO's progress and to cut losses if progress did not in fact occur. Lombard was either unwilling or unable to accept these modifications.

Again, but for Lombard's speculation, there is no evidence that BAH deliberately falsified any parts of its report or that it acted in an illegal or fraudulent manner. However, Lombard claims that the preparation of the report was flawed because BAH did not contact executives at the McDonnell Douglas Corporation and the Boeing Company, whose names were provided by Lombard, concerning NEWCO's likelihood of getting "outsourcing" contracts. He also faults the content of the report principally: (i) for failing to mention a tour of a Northrop facility by BAH staff during which Northrop executives allegedly made statements favorable to the NEWCO project; (ii) for criticizing Lombard's estimates of Puerto Rican labor costs; and (iii) for declining generally to adopt Lombard's highly optimistic view of NEWCO's prospects. He is also critical of Jones' ability to make such a study.

The GDB Board unanimously rejected Lombard's loan application. In doing so, it considered various factors other than the report. Nevertheless, we believe that, on the present record, a trier could find that the report was a substantial factor motivating GDB's decision. BAH was commissioned for the very purpose of affording guidance to the GDB Board; the Board's decision was consistent with BAH's recommendations; and even the EDA Administrator, an early NEWCO cheerleader, voted against the loan in his capacity as a member of the GDB Board after the BAH report was received.

After GDB rejected Lombard's application, one of EDA's executives sent BAH's report to the only other potentially interested lender, General Electric Corporation, which did not extend a loan. The record does not amplify the role that the BAH report may have played in whatever consideration, if any, General Electric gave to the NEWCO venture.

Unable to raise financing, Lombard then proceeded to bring the present action. Lombard's complaint sought damages on a variety of claims against most of the significant *dramatis personae* described above. It alleged claims against: (i) EDA and PRIDCO for breach of contract, *quantum meruit,* and promissory estoppel; (ii) EDA's Administrator, who was a member of GDB's Board, for breach of implied

warranty; (iii) GDB and/or its President for fraud and misrepresentation, tortious interference with contract, and intentional interference with prospective economic advantage; and (iv) BAH and/or Jones for breach of contract, *quantum meruit*, breach of third-party beneficiary contract, fraud and misrepresentation, tortious interference with contract, intentional interference with contract, intentional interference with prospective economic advantage, and negligence. The complaint sought damages in excess of $100 million.

All claims against all parties have been dismissed or settled. Lombard has appealed solely from the district court's grant of summary judgment dismissing his claims against BAH and Jones for tortious interference with prospective business relations and for "garden variety" negligence. (Appellant's Opening Brief at 22.)

## DISCUSSION

■ We review a district court's grant of summary judgment *de novo*. *See Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 41 (2d Cir.1991). Summary judgment is appropriate only when "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Montana v. First Fed. Sav. & Loan*, 869 F.2d 100, 103 (2d Cir.1989).

### a) *The Intentional Interference Claim*

■ Under New York law,[3] recovery of damages for tortious interference with prospective economic advantage must be based on a factual showing that: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship. *See Burba v. Rochester Gas and Elec. Corp.*, 139 A.D.2d 939, 528 N.Y.S.2d 241, 243 (N.Y.App.Div.1988); *see also Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir.2000); *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994). Although Lombard's case is thin with regard to the substantiality of his business relations with EDA, PRIDCO, and GDB—verbal encouragement but little else from EDA and PRIDCO, outright skepticism from GDB—the record is simply bereft of any evidence that BAH either acted solely to injure Lombard or used improper means to do so.

The evidence of a wrongful purpose offered by Lombard consists largely of BAH's failure to: (i) follow up on some sources of information allegedly favorable to the NEWCO project; (ii) draw allegedly correct inferences from a tour of a Northrop plant and conversations that occurred during it; and (iii) reach a conclusion that the project was not a risky investment. This showing at best demonstrates that BAH gave a hard look at NEWCO based perhaps on a slightly less than thorough investigation. It is, however, far short of the requisite showing of a wrongful purpose.

■ With regard to whether BAH resorted to methods sufficiently wrongful to be deemed tortious under New York law, a similar conclusion is required. Wrongful means include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic

---

3. The district court determined early-on that New York law applies to Lombard's claims against BAH, and the parties have proceeded on that understanding since. *See Lombard v.* *Econ. Dev. Admin. of Puerto Rico*, No. 94 CIV 1050(LAP), 1995 WL 447651, at *7 (S.D.N.Y. July 27, 1995).

pressure. More than simple persuasion is required. *See NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 497 (1996). More than simple persuasion was not shown here.

b) *The "Garden Variety" Negligence Claim*

■■■ Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach. *See Merino v. New York City Transit Auth.,* 218 A.D.2d 451, 639 N.Y.S.2d 784, 787 (N.Y.App.Div.1996); *see also Nathan W. Drage, P.C. v. First Concord Sec., Ltd.,* 184 Misc.2d 92, 707 N.Y.S.2d 782, 787 (N.Y.Sup.Ct.2000). Lombard argues that BAH owed him a duty to exercise reasonable care in preparing its report for GDB, did not exercise that level of care, and caused GDB to reject Lombard's loan application, leaving NEWCO stillborn.

Lombard's theory faces serious difficulties with regard both to a lack of reasonable care and causation. Even if BAH had a duty to exercise such care toward Lombard—and we conclude *infra* that it did not—only a very broad concept of reasonable care could be found to have been breached by a consultant's cautionary advice regarding the loan as actually proposed by Lombard. To be sure, Lombard's view of the NEWCO project's prospects was very rosy—a "conservative" estimate of a 2600% to 4160% return on the equity investment within five years. That view of NEWCO's prospects is reflected in the very gravamen of his negligence claim, namely that it was unreasonable for BAH to conclude that NEWCO was in any way risky. However, a potential lender would likely have, as GDB did from the start, a more cautious view.

Lombard's reliance on GDB itself indicates that private lenders did not share Lombard's rosy view. GDB presumably does not exist to compete with private lenders who deem a particular project to be loan-worthy. Rather, it exists to provide capital for projects that do not attract sufficient private capital. Even if BAH failed to get information from persons identified by Lombard as sharing his optimism and otherwise failed to conduct an entirely thorough investigation, there is little in this record to show that a more thorough investigation would have altered the ultimate recommendations of the BAH report. Lombard's plan called for a fully up-front and unsecured loan that would amount to as much as 77% of the capital raised. The lender would thus bear most of the risk but not share in the foreseen bonanza of profits. In this light, BAH's suggestion that the loan be spread among several lenders seems prudent rather than unreasonable, particularly given GDB's past experience with similar ventures. Moreover, the apparent impossibility of spreading the risk with other lenders rather undermines Lombard's position that it was unreasonable to view NEWCO as entailing a substantial risk of default.

Similarly, a fully up-front lender might reasonably be concerned about a plan that entrusted control of the venture to a management that would draw salaries from the capital provided but had zero investment of personal wealth. Even if early signs of failure were apparent, the lender would have no power to prevent the loss of its entire loan or to change management, which would have an incentive to risk—and spend—the entire capital. Such a lender would therefore want either a substantial financial investment by management or a staging of the loans.

■■■ Under New York law, however, decisions as to a lack of reasonable care and

its nexus to a plaintiff's injury are quintessential jury questions, largely as a result of developments in the personal injury area. Thus, "foreseeability and causation ... are issues generally and more suitably entrusted to fact finder adjudication, [while] the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges." *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189, 192 (N.Y. 1994). We therefore forgo the option of holding that the BAH report was either not prepared negligently or would have remained essentially unchanged even if more thoroughly researched. Instead, we turn to whether BAH owed Lombard a duty of care in preparing that report. Nevertheless, the discussion above of the risks to a lender in Lombard's plan is relevant to that question.

The liability to third parties for a defendant's negligent performance of a contract with a second party is a much litigated question in New York courts. However, decisions of the New York Court of Appeals clearly reject the position taken by appellant. We begin with a discussion of why the cases relied upon by Lombard yield a principle contrary to that which he argues. We then turn to New York decisions that directly bar his negligence claim.

Lombard relies most heavily upon a line of cases involving the liability of accountants to third parties for the negligent performance of an auditing contract with a client. These cases are, in Lombard's view, exemplified by *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). For our purposes, we accept his characterization of them as imposing liability on a defendant-accountant where the accountant has a relationship of near-privity with the plaintiff as demonstrated by: (i) the accountant's awareness that the plaintiff will use the report for a particular purpose; (ii) reliance by the plaintiff on that report in furtherance of that purpose; and (iii) specific conduct linking the accountant to the plaintiff. In Lombard's view, each element is present here, as follows. BAH knew that Lombard wanted a favorable BAH report in order to obtain a loan from GDB and, therefore, was relying upon that report. Moreover, BAH and Lombard were in direct contact as the report was being prepared. Because the report was not favorable—or at least not sufficiently favorable to persuade GDB to bear the full risk—as a result of BAH's negligence, BAH is liable to Lombard.

Such an application of the *Credit Alliance* line of cases, however, would grossly distort their meaning. In those cases, the plaintiffs changed their positions detrimentally in reliance on the accuracy of an accountant's report by lending funds to, or buying or selling securities of, the particular accountant's client. *See, e.g.,* 493 N.Y.S.2d 435, 483 N.E.2d at 111; *White v. Guarente*, 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315, 317–18 (1977); *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 275–76 (N.Y.1922). Lombard, however, did not intend to make an investment decision or otherwise change his position depending on the content of the BAH report. He simply wanted a favorable report to further his loan application. Rather, it was GDB that intended to rely upon the accuracy of the report in deciding whether to risk the $17 million up-front loan. Lombard has thus not shown that the expected "performance of [BAH's] contractual obligations [to GDB] induced detrimental reliance." *Eaves Brooks Costume Co. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220, 557 N.Y.S.2d 286, 556 N.E.2d 1093, 1096 (1990). Finally, the contacts between BAH and Lombard were not designed to

persuade Lombard to risk his funds by investing in GDB. Rather they were designed to allow him to make his best case to BAH in the hope that it would advise GDB to risk its funds by lending to Lombard.

■ Moreover, in the *Credit Alliance* line of cases, the accountant's client, although hoping that a favorable accountant's report will induce a third party to commit funds to the client, has a legal duty not to mislead the third party. *See, e.g.,* 483 N.E.2d at 120; *White,* 401 N.Y.S.2d 474, 372 N.E.2d at 319. Because of the requisite contact with the third party, the accountant knows that the third party will rely on the accountant's report and also knows of the role to be played by the report with regard to the client's obligations to be accurate to the third party. In the present matter, however, GDB had no obligation even to consider Lombard's loan application, much less to grant it, and BAH was not hired to communicate anything to Lombard, much less to induce detrimental reliance.

Lombard also relies heavily upon *Palka,* where a nurse employed by a hospital was allowed to recover for negligence by a defendant who had contracted to undertake the maintenance of the hospital's premises. 634 N.E.2d at 195. However, two factors that are absent in the present matter were critical to *Palka*'s reasoning.

■ The first factor was that a personal injury was involved in *Palka. Id.* at 190. Under New York law, liability to a third party for the negligent performance of a contract is broader in the case of personal injury than in the case of loss of property. *See Hall v. United Parcel Serv. Of America, Inc.,* 76 N.Y.2d 27, 556 N.Y.S.2d 21, 555 N.E.2d 273, 276 (1990).

The second factor critical to *Palka*'s holding was that a third party entering the hospital would expect that "someone" had responsibility for the exercise of reasonable care in maintaining the hospital building, 611 N.Y.S.2d 817, 634 N.E.2d at 192–93, whether or not the owner had contracted maintenance out to another party. Persons entering the premises were therefore entitled to rely on the defendant's performance of its maintenance contract with the hospital, and "the defendant's contractual obligation and the injured non-contracting plaintiff's reliance [on 'someone' exercising reasonable care] and injury [was] . . . direct and demonstrable." *Id.* at 193.

Unlike the expectations of a person entering a building as to the exercise of reasonable care in its maintenance, a loan applicant has no such expectation with regard to a potential lender. GDB was under no obligation to consider, much less scrutinize with reasonable care (broadly defined), Lombard's loan application. Unlike the plaintiff in *Palka,* therefore, Lombard had no reasonable expectation that "someone" had such an obligation, whether or not GDB sought outside advice. Rather, Lombard seeks to create an otherwise non-existent duty solely from BAH's contract with GDB.

■ Moreover, in both the *Credit Alliance* line of cases and *Palka,* the imposition on the defendant of a duty to the third party was not inconsistent with any lawful obligation of the defendant under its contract. One cannot lawfully contract with a client to mislead an investor or with a building owner to create an unreasonable risk of personal injury to a third party. However, a lender has no duty of care toward a loan applicant and is not barred from entering into a contract with a consultant that subjects a loan application to what may seem to a jury to be unreasonable scrutiny. Also, the lender wants to

be the sole judge of the quality of the consultant's performance.

In that light, the imposition of a duty on BAH's part to Lombard would not be consistent with BAH's contractual obligations to GDB. To be sure, a party in GDB's position may want a consultant like BAH to exercise reasonable care in evaluating the riskiness of a business plan submitted with a loan application. However, a party like GDB does not want a court or jury to determine whether the consultant has met that obligation in action against the consultant by the loan applicant. A lender certainly does not want a consultant like BAH to temper or alter its conclusions out of fear of a lawsuit brought by a disappointed loan applicant in which a jury's *ex post* view of events may lead to a damage award that is a very large multiple of the consultant's contract price. Lombard's view of the law, if adopted, would cause a consultant to fear just such a lawsuit arising from a negative report. As discussed above, BAH's recommendations with regard to the Lombard loan were hardly at great odds with the nature of the risk the fully up-front lender would have to undertake. Nevertheless, BAH is now being sued for over $100 million based on an expansive view of "garden variety" negligence. Exposure to such actions would, therefore, pose a great deterrent to a consultant's giving a hard look at a loan application, no matter what the interests or desires of the client.

Finally, if consultants are to be exposed to lawsuits by rejected borrowers, any knowledgeable consultant will demand a hold-harmless clause from the lender before embarking on an evaluation of a loan application. Lenders will then in essence have to assume a duty of care toward loan applicants if they opt to retain outside consultants. This result is perverse not only because it indirectly creates a new

duty for no particular reason but also because it drives loan evaluation in-house, again for no reason.

Lombard does not, therefore, find support in the New York caselaw on which he relies. Worse, there is caselaw directly against him. In *Hall*, an employee was forced from his job after failing a lie detector test administered during an investigation by his employer. 556 N.Y.S.2d 21, 555 N.E.2d at 275. The employee then sought to recover for negligence from the persons retained by UPS to administer the test. *See id.* The New York Court of Appeals held that such an action could not be brought. *See id.* at 278. Noting that if the injury suffered had been physical rather than reputational, recovery would have been allowed notwithstanding the lack of privity with the test operators, the court declined to create a new tort displacing or substantially altering the law of defamation, the traditional remedy for reputational damage. *See id.* at 276–77. Acknowledging the controversy over the reliability of lie detectors and the harm an erroneous finding can cause, the court nevertheless held that any change in the law regarding the use of lie detectors ought to be brought about by the legislature. *See id.* at 277–78.

The retention of lie detector operators by employers to monitor employee thefts and the hiring of outside consultants by lenders to evaluate loan applications are analogous. Moreover, in reaching its conclusion in *Hall*, the Court of Appeals relied heavily upon the absence of any remedy under New York law for injuries suffered as a result of negligent credit reporting. *Id.* at 276. Credit reporting and loan evaluations are of course even more directly analogous to each other than either is to the use of lie detectors. *Hall*'s reasoning therefore fully supports rejection of Lombard's theory.

Finally, in *Eaves Brooks*, a commercial tenant sought to recover for water damage to property from a malfunctioning sprinkler system. 557 N.Y.S.2d 286, 556 N.E.2d at 1094. The property owner defaulted and damages were sought from two firms that had, respectively, contracts to inspect the sprinkler system and to maintain an alarm that would warn of a sprinkler malfunction. *See id.* at 1094–95. The Court of Appeals denied recovery. *See id.* at 1097. Although acknowledging that the owner/lessor of the building had a duty to act reasonably in maintaining the sprinkler system, it declined to extend liability to parties not in privity with the lessee. *See id.* at 1096. Lombard's case is far weaker than that of the plaintiff-tenant in *Eaves Brooks* in that, like the contracts in the accountants' cases, the contracts between the defendants and the lessor related to a duty owed by the lessor to the plaintiff-tenant. *Eaves Brooks* thus indicates that New York law confines liability to third parties for the negligent performance of a contract to cases involving personal injuries such as *Palka*,[4] and the narrow characteristics—particularly detrimental reliance known to the defendant—common to the *Credit Alliance* lines of cases. *See Eaves Brooks*, 557 N.Y.S.2d 286, 556 N.E.2d at 1096. If the plaintiff in *Eaves Brooks* had no valid claim, Lombard's claim is *a fortiori* without merit.[5]

We therefore affirm.

---

**4.** In *Palka*, the Court of Appeals distinguished *Eaves Brooks* on the ground that it involved property damage rather than personal injury. *See Palka*, 611 N.Y.S.2d 817, 634 N.E.2d at 194–95.

**5.** We note that the Appellate Division, Second Department, has adopted our view in a case that Lombard concedes is inconsistent with his position. *See Chambers v. Executive Mortgage Corp.*, 229 A.D.2d 416, 645 N.Y.S.2d 91, 93 (N.Y.App.Div.1996).