Alexander Del Gtorno, J.
On July 26,1953, at about 1:0Q a.m. , claimant, Elijah E. Dowen, was operating his 1949 Mercury four-door sedan in a general southerly direction on New York Route 9K, also known as 9N, the Corinth-Luzerne highway, at a speed of 40-45 miles per hour. He had driven over this road only once before, and that was on his trip north in the opposite direction that same night. The weather was clear and the road was dry. He was accompanied by his brother, claimant Eugene S. Dowen, *557 and by claimant Harold Nichols, both of whom were riding with him as passengers,Nichols being seated in the center in the front seat.
Elijah E. Dowen, then 26 years of age, had been in military service for three years and had been discharged about 10 days prior to the date of the accident. He had purchased the automobile on July 21, 1953, and it was in good operating condition.
' At the time in question, he was operating it as an unlicensed driver, which fact was unknown to his passengers. He possessed a so-called G. I. license and had operated automobiles while . in the Army.
At about 11:00 p.m. of that night, the three had stopped at the Silver Dollar Restaurant and Bar in Luzerne. They danced there for a time. Elijah stated that he had one beer; Eugene said that he himself drank Coca-Cola and that his brother Elijah was drinking beer by the bottle, although he could not state the quantity he drank; Nichols said that he had two bottles of beer and that Elijah had one bottle of beer. They left between midnight and 12:30 a.m., and proceeded to return home along Route 9K. When they had reached a point near the so-called ‘6 River Road Farm ”, the automobile left the highway, struck a tree and guard rail on the east side of the highway and came to rest in a ditch. All of the occupants of the car suffered personal injury \ and the automobile was damaged.
'f A claim had been filed herein by Eugene S. Dowen, by Joseph H. Dowen, his guardian ad litem, now deceased, to recover damages for loss of services and medical expenses as the result ; of personal injuries sustained by the infant claimant, Eugene S. Dowen; by order of Honorable Stephen M. Lounsberry, then ' Presiding Judge of the Court of Claims, dated the 4th day of August, 1954. Effie B. Dowen, administratrix of Joseph H. Dowen, deceased, was duly substituted for claimant Joseph H. • Dowen. Eugene had attained his majority prior to trial.
The claimant, Great Eastern Fire Insurance Company, seeks to recover the sum of $850 under subrogation as the collision carrier on the automobile owned by Elijah E. Dowen. The property damage claim of Elijah is the sum of $100.
The highway, at the point of the accident, was 22 feet in width, with a macadam surface in good condition. The claimants, Elijah Dowen and Nichols, testified that they observed a “ Winding Road ” sign which was about 2,660 feet north of the scene, on the ' westerly side of the highway in the direction of travel. This sign was 36" x 36". Elijah noted that there was a solid line and ■■ a broken line in the center of the road, solid for southbound and *558 broken for northbound traffic, which extended for about 680 feet southerly. He noticed also that in the next 1,170 feet southbound, the road there being straight and on a downgrade of 6.32 degrees, there was a solid double white line. In the next 700 feet, there was a curve to the west with a degree of curvature of 8 degrees, a double white line being on -the road; there were guard rails on the westerly side of the highway which, extending around the curve and straightening below the curve, outlined the curve and the direction of the road below the curve. Elijah and Nichols saw all this. The next 110 feet before the River Road Farm was straight, with a solid line and a broken white line in the center of the road. In this area, there were guard rails on the westerly and easterly sides of the road, running due north and south. At the northerly end of the guard rails, on the easterly side of the road, before reaching River Road Farm northerly thereof, was the “ Slow ” sign facing southbound traffic. The evidence indicated that this sign was reflectorized by means of cat’s eyes and could be seen at night from a distance of between 250 and 300 feet. North of the guard rails was a white picket fence running in front of River Road Farm. The distance between this fence and the “Slow” sign was about 24 feet, and beyond, southeasterly, was a ravine.
Elijah’s testimony is that as he was traveling around the eight-degree curve, he was blinded momentarily by the lights of a car traveling north in the eastbound lane. He admits, however, that he saw the headlights of the other car before he saw the lights reflected off the trees toward the farmhouse at the beginning of the eight-degree curve. He must have seen that the other car was not dimming its headlights. He claimed that the shoulder and the entrance to the River Road Farm blended in such a way as to create the impression that the road extended up to the white picket fence in a rather straight line and away from the curve to his right. He assumed that the “ Slow ” sign was on the right-hand side of the road and headed his automobile in the direction of an opening between the fence and the “ Slow” sign. When he realized that the “ Slow” sign was on his left, he tried too late to go right.
Claimant Elijah states that he had been proceeding around the curve at the same speed he had ,been maintaining, but that at the time he was blinded, he took his foot off the accelerator and put his foot on the brake, slowing down somewhat. If the situation was what he states it was, he should have braked completely.
Under all of the circumstances, the court finds the claimant, Elijah Dowen, negligent in the operation of his automobile. He *559 did not operate Ms automobile as would a careful and prudent person in the exercise of reasonable care. His claim is dismissed, as is the derivative claim of Great Eastern Fire Insurance Company.
The remaining question to be decided is whether or not the State has been negligent, in order that the merits of the claims of Eugene S. Dowen, Effie B. Dowen, administratrix of Joseph H. Dowen, deceased, and Harold Nichols, may be determined.
The basic aim of the law and rules regulating traffic is to prevent accidents and to operate for the better protection of the people at large. (City of Rochester v. Ailing, 170 Misc. 477.) A highway may be said to be reasonably safe when people who exercise ordinary care can and do travel over it safely. (Boyce Motor Lines v. State of New York, 280 App. Div. 693, 696, affd. 306 N. Y. 801.) For the purpose of accomplishing this, the State Traffic Commission was created by section 95 of the Vehicle and Traffic law. Section 95-b provides: “ The state traffic commission shall have the power and it shall be its duty to adopt uniform rules and regulations, conforming, as far as is practical, with nationally accepted standards, concerning the size, shape, kind, color and type of traffic signs, signals and markings to be used on and along all state highways maintained by the state. All signs, signals and markings hereafter erected on or along such highways shall conform to such uniform rules. The state traffic commission may remove or order the removal of any such sign, signal or marking wMch it deems unnecessary or which does not conform with the rules and regulations of the traffic commission. The state traffic commission may order the erection or making and maintenance of any such sign, signal or marking as it may deem necessary to the safe and efficient use of such state highways.” The commission thereafter and on April 28, 1948, promulgated a Manual of Uniform Traffic Control Devices, the rules and regulations set forth therein becoming effective on September 1, 1948.
At page 15, the manual provides that “ All signs shall be located on the right side of the roadway, unless otherwise prescribed. Signs in any other position should ordinarily be considered only as supplementary to signs in the normal location. Under some circumstances signs may be advantageously placed on channelizing islands, or overhead or (as on sharp curves to the right) on the left shoulder of the road, directly in front of approaching vehicles ’ ’, and further, on the same page, ‘1 Curve signs should be located 300 feet ahead of the P. C. of the curve. Other signs should be located 300 feet in advance of the point or *560 location of hazard, unless otherwise specified for the particular sign. ’ ’
At page 77, the manual provides: “Curve signs shall be erected in advance of all curves where the recommended speed is determined to be 60 MPH or less, but more than 20 MPH. Where the recommended speed is 40 MPH or less, the Curve sign shall always be supplemented with a W 141 sign stating the recommended speed.” Page 78 of the manual provides that “ The recommended speed on curves will be determined by the use of the Ball Bank-Indicator. The recommended speed is that at which the indicator shows a reading of 10. It will be determined to the nearest five miles. For example, if the Ball Bank-Indicator reads 10 when the curve is run at a speed of 37 MPH, the recommended speed is 35 MPH. If the indicator reads 10 at a speed of 38 MPH, the recommended speed will be considered to be 40 MPH.” The curve sign is set forth on page 37 of the manual and is a yellow background with a black arrow showing the turn. The signs come in two sizes, the W 3 and W 4 which are 24" x 24" and the W 3A and the W 4A, which are 30" x 30", the former being standard and the latter for use where greater emphasis on visibility is required. It is provided that “ This sign shall be used at curves where the recommended speed is determined to he 60 MPH or lower, but more than 20 MPH. When the recommended speed is 40 MPH or less, it shall always be supplemented by a W 141 Stated Speed sign. It should be located 300 feet in advance of the P. C. of the curve.” Page 65 contains a visualization of this sign, which has a yellow background with the recommended speed in black letters. W 141 is 24" x 24", W 141A is 30" x 30", and “ The speed stated on this sign shall be considered as the maximum speed recommended under optimum conditions.”
Page 46 of the manual provides for a W 50 Hill Sign, 30" x 30", used “ to mark descending grades where experience indicates that vehicles are apt to have trouble unless warned of the grade. Unless definite evidence is available to show that vehicles are having trouble, or except in the ease of a dangerous combination of a grade and a sharp curve, it shall not be used on grades which do not meet the following minimum requirements. 6% grade, more than 2000 feet long ”,
The “ Winding Road ” sign is set forth on page 39 of the manual, and is known as W 9, 36" x 36", with a yellow background containing in black the words “Winding Road”. It provides that “ This sign shall be used wherever there is a succession of curves with or without short tangents between. It should be placed in advance of the beginning of the first *561 series of curves, and should be repeated every fourth or fifth curve. Except under unusual conditions, speed will not be stated. Where necessary to state the speed, the auxiliary W 141 Stated Speed sign shall be used. In addition to this sign, signs for special hazards may be required. In general, this sign will not apply to main routes as the conditions for its use will not be present. It should be confined to narrow, slow speed, meandering roads. Consideration should always be given to the possibility of using the Turn, Curve, Reverse Turn or Reverse Curve signs, rather than this sign. It should not be considered as a substitute for these signs on main highways which have a large number of curves. ’ ’
Route 9K is a highway between Saratoga. Springs and Corinth and Luzerne to the north, which leaves Route 9 at Saratoga Springs and rejoins it to the south of Lake George Village, Warren County. It is used as a by-pass of a traffic bottleneck caused by the City of Glens Falls and the narrow bridge across the Hudson River between that city and the Village of South Glens Falls on Route 9.
To the north of the scene of the accident, there were no signs indicating any speed other than compliance with section 56 of the Vehicle and Traffic Law, which fixes the maximum speed on public highways at 50 miles per hour in the absence of permission for greater speed.
On page 6 of the manual, there is an extract from minutes of a meeting of the State Traffic Commission held on April 28, 1948, reading: “ The Commission directed that, except as otherwise ordered, existing signs, signals and markings now in place on or along State Highways maintained by the State may be continued in use until no longer serviceable, at which time they shall be replaced by signs, signals or marking conforming to the Standards set forth in this Manual. ’ ’
The witness Scott, the assistant engineer in the Department of Public Works, Division of Traffic, testified that the department stopped using ‘1 Slow ’ ’ signs some 15 years ago, and that the reason was the word “ Slow ” does not mean much. He contended that the “Winding Road” sign described at page 39 of the manual was adequate, upon the ground that Route 9K is not a main road, but rather a meandering road.
The court finds that Route 9K is a meandering road as opposed to a main road, and that the placing of the “ Winding Road” sign in the position 2,660 feet north of the accident, without any intervening sign between that location and the scene of the accident was sufficient compliance by the State with the provisions of the manual. Further, this sign, having *562 been installed prior to the resolution adopting the manual and in conformity with the rules and regulations when erected, and which was in good serviceable condition at the time of the accident, was adequate to provide a warning to the reasonably careful driver. Under the circumstances, the failure of the State to conform the existing signs to the manual at the time and place in question was not the proximate cause of the accident. The manual is mandatory only in respect to any new signs or replacements. (McDevitt v. State of New York, 1 N Y 2d 540; Piragnoli v. State of New York, 305 N. Y. 586, affg. 280 App. Div. 849.)
There was introduced into evidence by the claimants a Ball Bank Test, made on August 26, 1954, of the hill and turn in question. This was the so-called Collamer test, having been made by one Collamer, an engineer, now deceased, as testified to by the witness De Pucchio, also an engineer, from notes left by Collamer. How the test was made he knew not. He could state only that the records indicated that Collamer made such a test. The readings on that test Avere as follows: At a run south, downhill, of 30 miles per hour, three tests indicated 5, 4 and 5; at 35 miles per hour, 11, 12 and 12; at 40 miles per hour, 18, 20 and 19.
The State, on the other hand, produced a record of a Ball Bank Test, made on February 21, 1957, by Mr. Scott, assisted by Mr. Knowland, whose title Avas principal engineering technician with the Traffic Division. These readings showed: At a run southbound at a speed of 40, the test indicated 5; at a speed of 50,10, 12,12,10, 10.
All things being equal, the court is bound to accept the test made by the State, since it was made by the very experts the State employs for just such tests. Furthermore, they could be and were cross-examined regarding the manner of their test, and they satisfied the court of their knowledge and accuracy of their test. Mr. De Pucchio was a fine witness, but he could only testify from the notes of a dead person, Avhich Avere bereft of the manner in which the test was made. In the exercise of care to simulate existing conditions at the time of the occurrence, the State experts even went to the extent of warming up the interior of the automobile used in the test prior to the test, as a cold interior could have an effect upon the accurate recording by the instruments.
The court accepts the results of the Ball Bank Test made by the State as being correct, which test indicates that there was a permissible and safe speed to be maintained Avhile pro *563 ceeding around the curve in question of about 47 to 50 miles per hour.
A traffic count made on the highway on August 9, 1953, between 7:00 a.m., and 7:00 p.m., was 4,000.
Mr. Scott, called as a witness by the claimants, testified to the happening of some 10 accidents taking place at various distances from the scene of this accident, some of which were in the general vicinity and others which were not. He testified that none of these happened in a manner similar to the one in question. This is no indication that the highway was so dangerous in the vicinity that the proximate cause of the accident was the State’s negligence (Boyce Motor Lines v. State of New York, 280 App. Div. 693, affd. 306 N. Y. 801, supra).
The witness Glassbrook testified that in August, 1927, two boys were killed when the car in which they were riding went into the ravine in the vicinity of the place where the instant accident took place. There was no proof, however, that a “ Slow ” sign was erected in 1927.
The probabilities are in favor of the defendant that the “ Slow ” sign Avas proper; that the defendant proved there Avas no accident between 1940 and 1953 in AA'hich people avIio Avere exercising ordinary care wore misled by the “ Slow ” sign.
Further, the case of Hubbell v. City of Yonkers (104 N. Y. 434, 439), held: “ The very fact that for ten years or more, this embankment had been in the same condition, and that, so far as appears, no similar accident had occurred, is most cogent evidence of the lack of any negligence on the part of the city in failing to guard this spot. It is upon this principle that several cases have been decided in this court, even with reference to carriers of passengers, in which case the law exacts a higher degree of care than it does in the case of municipal corporations in relation to their highAvays. That Avhich never happened before, and which in its character is such as not to naturally occur to prudent men, to guard against its happening at all, cannot, when in the course of years it does happen, furnish good ground for a charge of negligence in not foreseeing its possible happening and guarding against that remote contingency.”
In conclusion, in order to sustain a cause of action in negligence, the claimants must prove by a fair preponderance of the credible evidence that the defendant failed to exercise ordinary care. The court feels they have failed in such proof and finds that the sole proximate cause of the accident was the negligent and incompetent driving of claimant, Elijah E. Dowen.
Accordingly, the claims of Elijah E. Dowen, Great Eastern Fire Insurance Company, Eugene S. Dowen, Effie B. DoAven, *564 administratrix of Joseph H. Dowen, deceased, and Harold Nichols, are dismissed.
This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.
Let judgments be entered accordingly.