OPINION OF THE COURT
Richard E. Sise, J.
Claimant, Sarah Smith, as limited administratrix of her late husband Wilbur L. Smith’s estate, seeks damages for his wrongful death which allegedly occurred when, as he drove his automobile along a New York State highway, he left the lane of travel colliding with a guide rail, causing his automobile to flip over and land on its roof, resulting in claimant’s decedent’s instant death. The claim alleges negligence on behalf of the State of New York in the construction and/or maintenance of the guide rail system situated alongside of a state owned roadway. Defendant argues the accident occurred due to driver-alcohol impairment. Furthermore, defendant contends that the subject guide rail (erected in 1976 pursuant to contract specifications) was not designed to withstand the force of the collision involved in this accident, and that any maintenance failure did not contribute to the cause of this accident.
The subject accident occurred on December 5, 1997 at approximately 6:30 p.m. in the Town of Lloyd, Ulster County, New York. Shortly before that time, claimant’s decedent had driven to claimant’s residence located at 210 Vineyard Avenue (also known as New York State Routes 44 & 55 [Route 44/55]), Hyland, New York.[1] Upon arriving at the apartment complex’s parking lot, he remained in his vehicle. Soon after his arrival, claimant appeared on her stoop with two of their three children. Decedent remained momentarily then drove from the lot in his 1997 Pontiac Trans Am automobile. No conversation *555 occurred between claimant and decedent and no explanation was offered regarding why he left so abruptly. Shortly after decedent drove away, claimant heard two loud successive “bangs.”[2] She immediately called 911 reporting that there had been an accident in which she believed her husband was involved. She then left her apartment and ran to the scene of the accident which was a short distance west on Route 44/55. Claimant observed, much to her horror, that it indeed was her husband who had been involved in the accident as she saw his auto lying on its roof off the side of the road. As she remained roadside, a number of motorists stopped to look. One such person went to the decedent’s auto and opened the driver’s door, at which time, claimant saw her husband in the vehicle “bent over.” Immediately thereafter, claimant left the scene with one of her daughters who had become distraught at the sight. She later went to St. Francis Hospital in Poughkeepsie where her husband was taken by ambulance. There he was pronounced dead on arrival. No evidence was submitted to suggest he endured any pain and suffering.
Approximately 7V2 hours after the accident occurred, at 2:06 a.m., blood was drawn from decedent by an emergency room technician at the request of the local constabulary. The blood alcohol content (BAG) of decedent at that time proved to be .14%. This evidence was offered by the defendant to reflect the negligence of the decedent in the operation of his vehicle and thereby his contribution to the happening of the subject accident. At trial, claimant questioned the admissibility of the blood test results suggesting defendant’s failure to establish the required chain of custody regarding the blood sample taken. Furthermore, claimant objected to the introduction of this evidence based upon the failure of the police agency involved to comply with New York State Vehicle and Traffic Law § 1194 (2) (a) (l).[3] The court reserved decision and invited counsel to brief the issues upon submission of their post trial memoranda. The court will presently take up these issues.
*556 The Chain of Custody Rule
In view of the fungible nature of a blood sample, the proponent of the admission of the blood test results has the burden of establishing the chain of custody (see, People v Connelly, 35 NY2d 171, 174-175) and the failure to do so may be excused only where the circumstances provide reasonable assurances of the identity and unchanged condition of the sample (see, Amaro v City of New York, 40 NY2d 30, 35, citing People v Porter, 46 AD2d 307). Here, the emergency room technician who drew the blood from decedent gave it to Town of Lloyd Police Officer Joseph Gahm who had responded to the hospital with the department issued blood sample kit. Police Officer Gahm sealed and signed the sample and returned it to his department’s secure evidence room. On December 8, 1997, the sample was submitted by the Town of Lloyd Police Department to the New York State Police headquarters and lab at New-burgh, New York. It remained there until February 27, 1998 when it was transported by UPS[4] to the Western Regional Crime Laboratory of the New York State Police located in Olean, New York. There the sample was tested by Forensic Scientist Mark Waruck who was assigned to the toxicology section of the lab. Mr. Waruck testified that he received the subject blood sample from the lab’s evidence clerk on March 27, 1998. He verified that the sample arrived in a department issued blood sample kit. It was sealed per standard operating procedure and he saw no evidence of tampering. Once he performed a visual check to determine the sample had not spoiled, i.e., no blood clotting and no bacterial activity, he conducted a blood alcohol analysis by utilizing the method of head space gas chromatography. This analysis revealed the blood sample to have a level of .14% ethyl alcohol. Claimant, having offered no contrary direct testimony, nor elicited any responses upon cross-examination significantly contrary, the court finds the defendant has established the chain of custody for the subject blood sample and that the test results were accurate.
The Two-Hour Rule
Vehicle and Traffic Law § 1194 (2) and the New York State Department of Health Regulations (10 NYCRR 59.2 [c] *557 mandate that blood and breath tests shall be administered within two hours of arrest. This two-hour rule was enacted in 1941 when the Legislature provided that the results of tests measuring a driver’s BAG be admissible at trial if the test was administered within two hours of arrest (L 1941, ch 726, amdg Vehicle and Traffic Law former § 70 [5]; see generally, People v Ali, 151 Misc 2d 742 [Crim Ct, NY County 1991] for historical analysis of the two-hour rule). “Because the human body rapidly metabolizes alcohol, the two-hour requirement was enacted to ensure that the results of the blood test constituted probative evidence of the defendant’s blood alcohol level at the time of operation of the vehicle (see, Mem of Assemblyman Peterson [Assembly Sponsor] in support, Bill Jacket, L 1941, ch 726; People v Gursey, 22 NY2d 224, 229).” (People v Atkins, 85 NY2d 1007, 1009 [Simon, J., dissenting].) “It ordinarily takes 45 to 90 minutes to obtain a peak BAG level on an empty stomach and 2 to 3 hours if the alcohol is consumed with or after a meal, and the average rate of elimination for a 150-pound person is 7 grams [of alcohol] per hour.” (People v Victory, 166 Misc 2d 549, 558, citing Note, In Vino Veritas: The Truth About Blood Alcohol Presumptions in State Drunk Driving Law, 64 NYU L Rev 141 [1989].)
There has been ample scientific evidence offered to verify that the delay between the time of the arrest and the time a chemical test is given might significantly reduce the reliability of the evidence if that time period is too great. (See, Fitzgerald and Hume, Intoxication Test Evidence: Criminal and Civil § 2:30 [1987 ed, 1994 Supp] [“(T)he longer the delay between the time of (the) incident and (the) sample collection, the more difficult it becomes, scientifically, to draw reasonable inferences from one ‘data point,’ back to the ‘driving’ time”].)
While claimant, in this civil action, urges the exclusion of the BAG test results of decedent’s blood taken approximately 7V2 hours after the operation of a motor vehicle, this court is mindful that the Legislature adopted the two-hour rule to assist prosecutors in prosecuting drunk driving charges by eliminating the requirement of proving the scientific reliability of a BAG test in every prosecution. Thus, this statutorily created mandatory exclusionary rule is, by its terms, limited to criminal prosecutions of violations of this State’s Vehicle and Traffic Law. This court therefore shall not strictly apply the two-hour exclusionary rule to the case at bar. Rather, the analysis in this civil lawsuit must turn to the issue of whether the chemical test obtained beyond two hours from arrest is scientifically reliable and probative to be admissible.
*558 A critical factor in this analysis is that the claimant’s decedent was killed instantly in the subject accident. The defendant offered the expert testimony of Dr. Thomas G. Rosano, the Director of the Forensic Toxicology and Clinical Chemistry Laboratories of Albany Medical Center. He explained at length the metabolic processes involved as ethyl alcohol moves through the stomach, into the gastrointestinal tract, into the blood, into tissue, through the liver where the hepatic conversion occurs and the alcohol exits the body as carbon dioxide and water. Dr. Rosano related that at the time of death those factors that would change the level of alcohol in the blood have been eliminated. Specifically, since upon death the cardiovascular system shuts down and there is therefore no further circulation of blood to the liver, the primary avenue for the alcohol to leave the body is eliminated. Finally, Dr. Rosano opined that assuming the blood samples taken from the decedent were properly preserved, given that the death was instantaneous, the sample as tested by scientist Waruck nearly four months after the subject accident would reflect the actual blood alcohol content that existed at the moment of death. In a manner of speaking, upon decedent’s passing his blood alcohol level was frozen in time at .14%.
In view of the aforementioned expert testimony, and since the forensic scientist who performed the test found no spoilage, i.e., the sample was properly preserved, and further, there being no expert opinion offered contrary thereto, the court finds the results of the blood test taken beyond two hours from arrest to be scientifically reliable and probative evidence of the decedent’s blood alcohol level at the time of operation of his vehicle. Therefore, the claimant’s objection to the admission thereof is overruled. Having accepted the defendant’s proof regarding decedent’s blood alcohol level to be .14% at the time of his operation of his vehicle, the court finds that he was in violation of Vehicle and Traffic Law § 1192 (2)[5] and as such the defendant herein is entitled to the irrebuttable presumption that the decedent was legally intoxicated when he operated his vehicle. Furthermore, said violation amounts to negligence per se (see, PJI3d 2:25, 2:26). The opinion testimony of defendant’s expert Dr. Rosano concerning what effect the alcohol had on *559 the decedent’s ability to safely operate and navigate his vehicle was likely of the same kind provided to the Legislature when it passed the aforementioned driving while intoxicated (DWI) per se statute. This court has no doubt that decedent’s ability to operate and navigate his vehicle at the time of the accident was significantly impaired. The court notes that given its finding that decedent violated the per se DWI statute, Dr. Rosano’s testimony concerning the effect of alcohol on the human brain and motor skills, however enlightening, is superfluous. The issue the court is left to decide regarding the conduct of claimant’s decedent is whether his violation of Vehicle and Traffic Law § 1192 (2) was a proximate cause of the happening of the accident (see, Sewar v Gagliardi Bros. Serv., 69 AD2d 281, affd 51 NY2d 752). This court finds that it was. The court shall next consider the conduct of the defendant and whether such conduct was a proximate cause of the happening of the accident.
Lawrence A. Falcetta, Jr. was traveling alone in his vehicle in a westerly direction on Route 44/55 when he witnessed the subject accident. At approximately 6:30 p.m. it was “dusk and damp” and the road surface was wet. He first saw decedent’s vehicle as it pulled out of the Brookside Apartments’ parking lot onto Route 44/55. He observed “nothing out of the ordinary” regarding the manner in which decedent pulled out of the lot onto the highway. Mr. Falcetta was greater than 200 yards behind decedent when he first observed him enter upon Route 44/55. He observed decedent for approximately three or four seconds traveling ahead of him when he disappeared from sight for a second or two due to a slight bend in the road to the right. When he regained sight of decedent, Mr. Falcetta had closed to within 150 yards of his vehicle since he was already moving when decedent entered onto the highway from a feeder driveway. From this distance, Mr. Falcetta saw the decedent’s Trans Am leave the road, strike the guide rail and “go up and over, and down the embankment.”
Mr. Falcetta continued on Route 44/55 to the scene of the accident. The section of the guide rail struck by decedent was dislodged and no longer in place. He was therefore able to drive his car through the gap and shine his headlights onto the decedent’s car which he observed had come to rest on its roof at the bottom of a grassy culvert. It was at this time that Mr. Falcetta recognized the vehicle to be that of decedent. He called out his name, but received no response. He then ran down the embankment, opened the driver’s door and saw the decedent *560 whose upper torso was covered in leaves and soil. Since the vehicle was still running, Mr. Falcetta unplugged the fuel line to shut it down. Thereafter, he called the police to the scene.
No other person witnessed the happening of the accident.
Claimant called Peter Teliska, a New York State Department of Transportation (DOT) Resident Engineer for Ulster County. At the time of the accident he was a Resident Engineer for Eastern Orange County. He acknowledged that guide rail inspection and maintenance is the responsibility of DOT specifically citing section 3.612 of the Department of Transportation’s Highway Maintenance Guidelines in effect since 1978. Once a year, after the winter months, the guide rails are inspected for nonalignment and for damage to any rail or support post. When shown claimant’s exhibit number 60, a photo from the department’s photo log taken on August 16, 1990 depicting the subject guide rail with the beam and a support post out of alignment, he stated that if he were to observe a guide rail in this condition he would direct its repair.
The construction and installation of the subject box beam guide rail was completed on July 27, 1977 (exhibit 93) pursuant to the design specifications of the New York State Department of Transportation approved in December 1975 (exhibit 92). The claimant offered chapter 10 of the New York State Department of Transportation’s Highway Design Manual issued in 1972 with revisions dated January 1977 and an engineer’s letter dated July 21, 1966 (exhibit 3), along with the American Association of State Highway and Transportation Officials as sources for the acceptable standards and design specifications for the construction and installation of box beam guide rails along state highways. Notwithstanding the completion of the installation of the subject box beam guide rail system occurred some six months after the issuance of the 1977 revisions, in view of the fact that the subject guide rail system was designed by DOT prior to the issuance of said revisions, the court shall give no consideration to said revisions as same were not acceptable standards at the time of the planning and designing of the subject highway project.[6]
Both claimant and defendant offered expert witnesses who offered their opinion as to the cause of the happening of this *561 accident. Claimant offered Lawrence Levine a licensed professional engineer with additional educational background and experience in the field of accident investigation and reconstruction. He advised that the subject guide rail is commonly referred to as a “box beam” type. It was constructed of steel of 3/s inch thickness with four sides each measuring six inches. The box beam was mounted upon “H” shaped steel posts installed into the ground. According to Levine, the purpose of the guide rail was to stand between the road and a hazard, where the hazard cannot be eliminated. The guide rail is seen as less of a hazard by intercepting, decelerating and redirecting the vehicle back onto the roadway.
Claimant’s expert opined that the subject guide rail was neither constructed in compliance with DOT standards in effect at the time of installation, nor was it constructed in compliance with the design specifications as approved by DOT. Additionally, he provided his opinion that DOT had failed to maintain the subject guide rail system pursuant to its own highway maintenance guidelines. All contributing to the happening of this rollover accident.
Mr. Levine testified that it was hazardous to have installed the end piece of the guide rail with such a sharp curve and commencing at a location beyond where the curve in the road began. Rather, the guide rail should have begun beyond the “point of need” and had a 15 degree angle as drawn from the hazard location to the road. This, he said, would more likely have redirected the Smith vehicle back onto the roadway. He also added the alternative that the hazard could be completely eliminated by burying the culvert beneath ground and shaping the topography above in such a gradual sloping manner so as to allow an errant motorist to either redirect his vehicle back upon the roadway or to bring his vehicle safely to a stop off road. Additionally, Mr. Levine cited the state’s failure to install the support posts three feet apart as called for pursuant to the engineer’s letter of 1966, given the proximity of the hazard to the guide rail system. In his opinion, the installation of the support posts six feet apart contributed to the overall instability of the guide rail system. Finally, Mr. Levine testified that the applicable design specifications provided that the fabrica *562 tion of the curved sections of the guide rail system was to occur in the shop and not in the field. Upon review of the photographs taken of the guide rail after the accident, DOT photo logs and the testimony of Officer James Plass, Levine was of the opinion that the original weld[7] at or near the point of impact was faultily done in the field as evidenced by the fact that it “snapped off like a tack weld.” Had the fabrication process included the appropriate shop weld, in his opinion, the rail system would have absorbed the impact and bent, but would not have snapped in two as it did.
Claimant, in support of her claim of negligent maintenance, as well as to satisfy the notice requirement, offered a series of log photos taken by DOT (exhibits 36-78). These photos of the subject highway, shoulder and guide rail were taken automatically, every 52.8 feet, by a camera mounted near the rear view mirror of a DOT truck. They are taken every three to five years and are used by DOT as an inventory tool. These photographs depict the subject guide rail as it appeared in 1979, 1984, 1990 and 1995.
Upon a review of these log photos, taken over a 16-year period, one can readily see that the subject guide rail has sustained physical damage. As explained by Mr. Levine, it is not unusual for the wing blade of a state owned snowplow to come into contact with the box beam rail or with one or more of the support posts. Furthermore, snow and salt plowed against the guide rail system contribute to corrosion of the metal guide rail system. The photo taken in August 1979 clearly depicts that a post and its angle bracket have separated from the box beam rail and are angled downward (exhibit 51). Mr. Levine testified that very near this damaged post was the weld which he believed failed as a result of improper fabrication. In photos taken in May 1984 (exhibits 54, 55), according to Mr. Levine, the height of the box beam rail has changed. From the weld towards the eastern terminus it appears to be lifted upward somewhat. Further, in these photos, the post that appeared to be angled downward in the 1979 photo is down on the ground, and the post immediately to the west of this downed post is separated from the box beam rail and is angled downward. Mr. Levine also noted that there appears to be rust on the face of the box beam near the weld. In photos taken in August 1990 (exhibits 59, 60), according to Mr. *563 Levine, there is a lot more rust evident on the box beam, the damaged posts mentioned above appear to be bent away and twisted worse and the height of the box beam appears to have further elevated. In a photo taken in May 1995 (exhibit 64), according to Mr. Levine, there is a third post missing and rust is still evident on the box beam near the weld. Claimant’s expert testified that the three sections of box beam rail, measuring approximately 18 to 20 feet, running at an angle from the road towards the stone pillar depicted in exhibit 64, were supported by only one post located in the middle of this stretch of rail. Mr. Levine testified that each post represents a factor in the overall strength of the rail system. A loss of a supporting post or posts decreases the amount of pounds of force the rail system can withstand.
Having reviewed the photographs taken of the two halves of the box beam rail, Mr. Levine expressed his opinion that the rail failed at this juncture because the weld was done improperly. According to Mr. Levine, when welding two pieces of metal together, one should bevel the edges so that the weld penetrates the whole thickness of the steel. Furthermore, all of the galvanized areas on the edges to be welded must be ground clean, as the weld will not penetrate the galvanized surface. In the opinion of Mr. Levine, the weld located very near the point of impact was a tack weld, i.e., the edges were butted up against one another and the surfaces were welded together. As further evidence of this faulty weld process, Mr. Levine pointed to locations upon the photographs to what he believed depicted galvanized metal and areas of rust located upon the surface of the edges where the two halves of box beam rail snapped. This was evidence that the galvanized surface had not been ground free before welding began, and, since rust was present, the integrity of the weld had been comprised some time prior to the happening of the subject accident, all factors contributing to the weakness of the guide rail system.
Claimant’s expert reviewed the photos which depicted the damage to the vehicle, reviewed the measurements of a car similar to the subject vehicle, considered that the DOT standards in effect when the guide rail was built called for a height of 30 inches from the ground to the top of the box beam rail, and consequently offered his opinion that had the guide rail been properly maintained by DOT, it would have withstood the force of the impact, there would have been contact with the Trans Am’s engine block and the vehicle would have been *564 redirected back onto the roadway thereby avoiding this rollover accident.[8]
Finally, Mr. Levine offered his opinion that the speed of the Smith vehicle at the time of the collision with the guide rail was between 30 to 35 miles per hour well within the 45 miles per hour recommended speed limit. Based upon the photographic evidence which depicted the damage to the vehicle as well as damage to the box beam guide rail, Mr. Levine was of the opinion that the point of impact with the guide rail was near the abovementioned weld which was located close to where rural delivery mailboxes were positioned. Based upon this location, Mr. Levine testified that the angle of impact was approximately 44 degrees.[9] The angle of impact is significant as it relates to the calculation of force with which the Smith vehicle struck the guide rail. Mr. Levine indicated given the speed of the vehicle, i.e., 30 to 35 miles per hour, the weight of the vehicle with occupant, i.e., 3,500 pounds and the angle of impact as above noted, the box beam as designed should not have failed.
The defendant offered Nicholas Pucino a licensed professional civil engineer.[10] In reviewing this accident and in preparation for providing his opinion in this matter, Mr. Pucino had DOT conduct a topographical survey of the accident scene (exhibit J). While at the scene, on April 20, 2000 and March 23, 2001, he examined, photographed and videotaped the box beam guide rail.[11] Mr. Pucino testified that upon these visits to the scene he observed etched marks on the face of the beam, scrape markings on the underside of the beam and bends at the splice plate. All of this damage was seen within a six foot length of the beam. He expressed his opinion that this damage, visible *565 and observed by him three plus years after the subject accident, was caused by the Smith vehicle. Based upon these observations, the topography of the surrounding area, the DOT plans for this guide rail system, as well as the police accident reports and the measurements of a sample vehicle, Mr. Pucino offered his opinion as to the point of impact (see, exhibit K [an enlargement of the DOT topographical survey with Mr. Puci-no’s addition reflecting his analysis of the path of the Smith vehicle and point of impact]). Mr. Pucino concluded that the point of impact was closer to the eastern terminus of the guide rail than as found by claimant’s expert. Furthermore, by his calculation, the angle of impact was a minimum of 64 degrees. At that angle, if the Smith vehicle had been traveling at 45 miles per hour “and some other speeds below that” the guide rail would have broken away.
As mentioned above, Mr. Pucino took certain measurements of a sample Trans Am vehicle. He also reviewed the testimony of Officer Plass who undertook an accident reconstruction immediately following the accident and he reviewed photographs depicting the damage to the Smith vehicle. He reached an opinion that based upon the design and dimensions of the Trans Am, it drove beneath the guide rail and did not have contact with it until the front of the car had passed some distance beyond the face of the box beam rail.[12] The rail was then lifted upward as the car moved forward and down the embankment. Pucino also opined, even if the car had not passed beneath the beam, with the angle of impact, as above noted, together with the speed of the vehicle, the rail would have broken in any event. Finally, on the issue of the adequacy of the weld, Mr. Pucino believes that the weld was indeed a shop weld as called for by the specifications. Any rust near the weld shown in the photographs was merely rust stains that had formed from water falling from nearby rusted mailboxes. He saw no rust corrosion within the weld.
Credibility is a critical issue in any claim before the court. Weighing evidence and assessing veracity of conflicting testimony is a task for which there is no precise or flawless test. There are no juries in the Court of Claims and therefore the court’s responsibilities include deciding witness credibility *566 and resolving factual disputes (LeGrand v State of New York, 195 AD2d 784, lv denied 82 NY2d 663; Colangione v State of New York, 187 AD2d 844; Raynor v State of New York, 98 AD2d 865; see, Savio v State of New York, 268 AD2d 907, lv denied 95 NY2d 758). This task is placed in sharper focus when the court is presented with expert testimony; testimony which is intended to aid the factfinder by helping to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror (see, De Long v County of Erie, 60 NY2d 296, 307). The court, however, is not required to accept an expert’s opinion to the exclusion of the facts and circumstances disclosed by other testimony and/or the facts disclosed on cross-examination. The court may reject an expert’s opinion if it finds the facts to be different from those which formed the basis for the opinion or if, after careful consideration of all the evidence in the case, it disagrees with the opinion. Put another way, the court when faced with conflicting expert testimony is entitled to accept the theory that, in its view, best explains the point in issue and is supported by the evidence (see, Shaw v Binghamton Lodge No. 852, B.P.O. Elks Home, 155 AD2d 805, 806; see also, Finn v Cassidy, 165 NY 584, 592).
Considering all of the testimony, the photographic evidence as well as the demonstrative evidence offered by the experts, this court accepts that portion of the claimant’s expert’s opinion concerning the state’s construction of the subject guide rail contrary to the specific design specifications, as well as its failure to maintain the subject guide rail pursuant to the Department of Transportation’s own Highway Maintenance Guidelines. The court finds that the point of impact between the claimant decedent’s vehicle and the box beam guide rail was at the location of the much referred to weld, and that said weld was faultily applied thereby allowing invasive and corrosive rust to weaken the rail system. Furthermore, as is evidenced by the several photo log photographs, the subject box beam guide rail was left in disrepair for many years leading up to this accident as evidenced by the downed and disconnected support posts, missing support posts and the elevation of the box beam rail above its intended height. Although there was no evidence of any prior reported motor vehicle accident having occurred at the subject location, clearly there was some source of trauma to this guide rail system that went unreported.
It is well established that the state is under a nondelegatory duty to maintain its roadways in a reasonably safe condition *567 for motorists who obey the rules of the road. (Friedman v State of New York, 67 NY2d 271; Tomassi v Town of Union, 46 NY2d 91.) The state is required to build a reasonably safe roadway consistent with the standards applicable at the time of design and construction (Friedman, supra at 284; Schwartz v New York State Thruway Auth., 61 NY2d 955; Holscher v State of New York, 59 AD2d 224, 227, affd 46 NY2d 792; Rinaldi v State of New York, 49 AD2d 361; see also, n 5, supra). Yet, there is generally no obligation by the state to upgrade the structure which was originally built in compliance with applicable law solely because of changes in design specifications and standards (Merino v New York City Tr. Auth., 218 AD2d 451, 457; Benjamin v State of New York, 203 AD2d 629; Rittenhouse v State of New York, 134 AD2d 774, 776; Dowen v State of New York, 11 Misc 2d 555, 562). Where appropriate, it must erect and maintain guide rails (Colegrove v County of Steuben, 216 AD2d 888). The state is not an insurer of the safety of motorists, and negligence cannot be inferred from the mere happening of an accident (Edwards v State of New York, 269 AD2d 863; Hamilton v State of New York, 277 AD2d 982, lv denied 96 NY2d 704).
In claims based upon negligent design, the state is entitled to qualified immunity for claims arising out of its highway planning decisions, unless its study was plainly inadequate or lacked a reasonable basis (see, Weiss v Fote, 7 NY2d 579). There are “[s]trong policy considerations” behind this doctrine, and it should therefore not be “lightly discounted” (Friedman v State of New York, 67 NY2d 271, 285).[13]
To prevail, a claimant must prove that the injuries he or she sustained were proximately caused by the state’s negligence (see, Hamilton v State of New York, supra; Edwards v State of New York, supra). Generally, liability will not attach unless the state had either actual or constructive notice of a dangerous condition and then failed to take reasonable measures to correct the condition (see, Brooks v New York State Thruway Auth., 73 AD2d 767, affd 51 NY2d 892; Rinaldi v State of New York., 49 AD2d 361, 363; see also, Ernest v Red Cr. Cent. School Dist., 93 NY2d 664, 673, rearg denied 93 NY2d 1042). The *568 court finds that the defendant had both actual and constructive notice of the dangerous and defective condition that existed on State Route 44/55 where this accident occurred. The court further finds that defendant’s negligent construction and maintenance of the subject guide rail was a proximate cause of the claimant’s decedent’s accident.
Having found that both the defendant State of New York and the claimant’s decedent were negligent and that their negligence was a proximate cause of the happening of this accident, it is for the court further to decide what percentage of the whole each party was responsible. While this court recognizes that operating a motor vehicle while in an intoxicated state is indisputably a serious violation of the law, this would preclude recovery by the claimant only if there were no other proximate cause to the happening of the accident (see, Alami v Volkswagen of Am., 97 NY2d 281). “The fact that decedent’s ability to drive was impaired does not exonerate the State from liability on the ground that its negligence was not one of the proximate causes of the accident” (Humphrey v State of New York, 60 NY2d 742, 744). As in Humphrey, the claimant’s decedent’s criminal act of driving while intoxicated was not the only cause of his accident. Undoubtedly, his reflexes were slowed, his judgment impaired, which combined with the state’s negligent construction and maintenance of its guide rail system, caused his death. Accordingly, the court apportions liability 20% attributable to defendant and 80% attributable to claimant and will set the matter down for a trial on the issue of damages as soon as practicable.
All motions not previously ruled upon are hereby denied.

. Claimant and claimant’s decedent were separated at the time of the accident. They had lived at separate addresses for approximately 10 months before the accident occurred.

. All quotations are from the court’s notes or the audiotapes of the proceeding unless otherwise noted.

. This statute “provides that any person who operates a motor vehicle within the State shall be deemed to have consented to the administration of a chemical blood alcohol test conducted ‘at the direction of a police officer * * * having reasonable grounds to believe’ that such person was driving in violation of Vehicle and Traffic Law § 1192 (driving under the influence of alcohol or drugs), provided that the test is administered ‘within two hours after such person has been placed under arrest for any such violation.’ ” (People v Goodell, 79 NY 869, 870.)

. Upon cross-examination, State Police Forensic Scientist Mark Waruck testified that “probably 55 or 60% of specimens that are received at the Western Regional Crime Laboratory are submitted by either UPS, Federal Express, Airborne Express or the US Postal Service” with the balance hand delivered by local agencies.

. This section of the DWI statute captioned “Driving while intoxicated; per se” provides in pertinent part that “[n]o person shall operate a motor vehicle while such person-has .10 of one per centum or more by weight of alcohol in the person’s blood as shown by chemical analysis of such person’s blood * * * .” (Vehicle and Traffic Law § 1192 [2].)

. There is no duty to reconstruct highways to make them conform to safety standards that evolve subsequent to the completion of the original construction. (Holscher v State of New York, 59 AD2d 224, affd 46 NY2d 792; Van De Bogart v State of New York, 133 AD2d 974.) This court is of the opinion that the rationale behind the line of cases which follows Holscher leads to the conclusion that the standards in effect when the project’s design *561 specifications are approved by state engineers control, notwithstanding the completion of construction may occur after newly issued standards. The court notes given its findings of fact in this claim, its ultimate findings regarding the issue of liability would be the same whether or not the January 1977 revisions were applicable standards.

. The subject contract specified that certain lengths of steel were to be used to fashion the above described box beam guide rails with welds at certain locations to join these lengths.

. On cross-examination Mr. Levine acknowledged that the plans called for the box beam rail to have an additional height of three inches where the road has a super elevation. He further acknowledged that the subject highway did have a super elevation for drainage purposes. It was his opinion, based upon the damage to the Trans Am, that the subject box beam was 33V2 inches in height. Thus higher than the standards called for.

. Claimant’s expert upon further questioning on direct examination indicated the angle of impact could be as small as 30 degrees' or as great as 45 degrees.

. Mr. Pucino acknowledged during the voir dire conducted by claimant’s counsel that he was not an accident reconstruction specialist, nor did he have any experience conducting accident analysis based upon crush analysis.

. It was established at trial that shortly after the accident, DOT reassembled the guide rail using the existing rail system. There was no evidence as to specifically what sections of rail were reused and how they were repositioned or reconfigured.

. It was Mr. Pucino’s opinion that the underside of the box beam rail came into contact with the location on the Trans Am where the cowl and hood met. He further highlighted what he believed to be damage to the radiator plate as depicted in exhibits 18 and 29. This testimony was offered to support his opinion that the vehicle passed beneath the rail.

. The court notes that although the claimant’s expert offered his opinion, without objection, that the defendant failed to properly design the guide rail system and/or roadway, the claimant failed to allege same in her claim or verified bill of particulars. Nevertheless, had the claimant so pled, the court would find on this record that the doctrine of Weiss v Fote (7 NY2d 579) would entitle the state to immunity.