**AMERICA ONLINE LATINO, et ano., Plaintiffs,**

v.

**AMERICAN ONLINE, INC., et al., Defendants.**

No. 02 Civ. 4796(LAK).

United States District Court, S.D. New York.

March 13, 2003.

---

Gregory J. Miner, Barrett C. Mersereau, Donald A. Kaplan, Preston Gates & Ellis LLP, for Defendant Dotster, Inc.

Richard J. Tashjian, Tashjian & Padian, for Defendant Inktomi Corporation.

Shari Claire Lewis, Rivkin Radler LLP, for Defendant VeriSign, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

■ Mark Anthony Esposito, one of the plaintiffs in this case is the sole proprietor of a business which he refers to as America Online Latino ("AOL–Esposito") and which he hoped would become an Internet service provider ("ISP") to serve the U.S. Latino community.[1] AOL–Esposito should not be mistaken for America Online, Inc. ("AOL"), a defendant in this case and the world's largest ISP. The matter is before the Court on motions by all of the defendants to dismiss plaintiffs'[2] second amended complaint.

*Facts*

*Defendants*

The defendants in this case are AOL, Dotster, Inc. ("Dotster"), VeriSign, Inc. ("VeriSign"), and Inktomi Corporation ("Inktomi"). AOL, as noted, is the world's largest ISP and has been in business for at least ten years.[3] Dotster is an approved

---

Michael E. Breslin, for Plaintiffs.

David Wynn, Michael A. Grow, James R. Davis, II, Arent Fox Kintner Plotkin & Kahn, PLLC, for Defendant American Online, Inc.

**1.** Second Amended Complaint ("Cpt.") ¶¶ 1–2, 8.

**2.** The complaint names both Esposito and AOL–Esposito as plaintiffs. The capacity of AOL–Esposito to sue is governed by New York law. FED. R. CIV. P. 17(b). Sole proprietorships, as distinguished from their proprietors, lack such capacity. *E.g., M Sports Prod. v. Pay–Per–View Network, Inc.,* No. 97 Civ. 6451(HB), 1998 WL 19998, at *1 n. 2 (S.D.N.Y. Jan. 20, 1998); *Provosty v. Lydia E.*

*Hall Hosp.,* 91 A.D.2d 658, 659, 457 N.Y.S.2d 106, 108 (2d Dept.1982), *aff'd,* 59 N.Y.2d 812, 464 N.Y.S.2d 754, 451 N.E.2d 501 (1983); *Little Shoppe Around the Corner v. Carl,* 80 Misc.2d 717, 719, 363 N.Y.S.2d 784, 787 (1975). The action therefore is dismissed insofar as it is brought on behalf of AOL–Esposito. All further references to "plaintiff" refer to Esposito himself.

**3.** Cpt. ¶¶ 3, 33(C).

domain name registrar.[4] VeriSign provides small business Internet services to individuals through, among other things, a web site division called Image Café, which was renamed Web Sites from VeriSign in October 2001.[5] It also offered a search engine placement service called SureList which, the Court infers, sought to place web sites of VeriSign clients on Internet search engines.[6] Inktomi provides database search engines which power search functions of such Internet companies as AOL and MSN.[7] It is alleged also to have had a contractual relationship with VeriSign.[8]

### The Controversy

The following statement of facts is taken from the second amended complaint, the allegations of which are deemed true for purposes of this motion.

### Esposito Starts the Business

On March 15, 2000, Esposito registered the domain name <americaonlinelatino.com> with Dotster with plans to create an ISP to serve the U.S. Latino community.[9] In May 2000, he began negotiations with AOL with a view to AOL acquiring the <americaonlinelatino.com> domain name, perhaps among other assets.[10] In June 2000, AOL registered <aolatino.com> to prepare to enter the U.S. Latino market.[11] Nevertheless, negotiations continued between AOL and Esposito.

In July of that year, Esposito moved the web site to VeriSign's Image Café division

pursuant to a contract under which VeriSign agreed to maintain the web site in exchange for a fee.[12] At about the same time, Esposito subscribed to VeriSign's SureList service which, the complaint alleges, promised "inclusion" in Inktomi's search engine databases.[13] After making these arrangements, Esposito began developing the America Online Latino web site, which allegedly "reached the number one ranking on the Inktomi search engines ... when searching for LATINO.ISP." [14]

### AOL's WIPO Complaint

AOL apparently decided on a change in strategy in the summer of 2001. In August of that year, it filed a complaint against Esposito before the World Intellectual Property Organization ("WIPO"), the gist of which seems to have been that Esposito's <americaonlinelatino.com> domain name was confusingly similar to AOL's America Online trademark and that Esposito had registered and was using his domain name in bad faith.[15]

### Esposito's Problem With VeriSign

In October 2001, while the WIPO arbitration was pending, Esposito was "blocked" from accessing his Image Café account through the VeriSign web site.[16] While the complaint is not entirely clear, the Court infers that this meant that Esposito could not access his web site content and that this temporarily shut down or

4. *Id.* ¶ 4.

5. *Id.* ¶ 5.

6. *Id.*

7. *Id.* ¶ 6.

8. *Id.*

9. *Id.* ¶ 8.

10. *Id.* ¶ 15.

11. *Id.* ¶ 16.

12. *Id.* ¶ 10.

13. *Id.* ¶ 11.

14. *Id.* ¶¶ 12–14.

15. *See id.* ¶¶ 21, 31–32.

16. *Id.* ¶¶ 23, 25.

otherwise interfered with his operation.[17] At about the same time, searches on LookSmart, one of many search engines that used an Inktomi search engine, produced what the complaint describes as "an unusual search result display"[18] when queried for "Latino.isp," although the complaint does not explain what was unusual about it. According to plaintiff, this unusual display was unique to searches on LookSmart which, plaintiff suggests, meant that Inktomi must have performed custom programming to achieve this result.[19] Moreover, plaintiff claims that clicking on the line of the LookSmart search result that listed <americaonlinelatino.com> caused the user's computer to "crash" and shut down, thus denying access to the web site.[20]

These difficulties, plaintiff claims, were no accident. All occurred within a two month period, only a short time after AOL began the WIPO arbitration. "VeriSign, Inktomi, and Dotster had no reason to destroy Plaintiffs' [sic] growing company."[21] As AOL allegedly had a motive to do so, he alleges, it must have agreed with Dotster, Inktomi and VeriSign "to remove Plaintiffs' [sic] from the Internet."[22]

*The WIPO Arbitration Decision*

On November 20, 2001, a WIPO administrative panel determined that the domain names registered by Esposito, including <americaonlinelatino.com>, were confusingly similar to AOL trademarks; that

AOL has intellectual property rights in the marks "AOL," "American Online," and "AOL.COM;" that plaintiff had no such rights; that AOL had proved "a degree of bad faith," and that Esposito had shown no "legitimate business need for the domain names" he had registered. It directed transfer of the <americaonlinelatino.com> and certain other registered but inactive domain names to AOL.[23]

Esposito was unhappy with the WIPO decision. On November 30, 2001, he purchased an index number from the New York County Clerk for the commencement of an action on behalf of himself, AOL–Esposito, and "Latino Community" against AOL Time Warner, Inc. ("AOLTW"), AOL's parent company, the WIPO, and Paul Mason, the WIPO arbitrator who rendered the decision. "Promptly" after purchasing the index number, Esposito sent e-mails to AOL's attorney, WIPO, and Dotster in which he notified them that he had filed the lawsuit and advised them of the court in which he had done so and the index number.[24] Dotster nevertheless transferred the domain names to AOL pursuant to the WIPO decision.

*Prior Proceedings*

Esposito's state court action lay dormant for some months thereafter. On or about March 27, 2002, however, a copy of a summons with notice[25] was delivered to AOLTW, which removed the action on

---

17.  *See id.* ¶ 25.

18.  *Id.* ¶ 26.

19.  *Id.* ¶ 27.
     In fact, the complaint may be inconsistent on this point. Paragraph 27 alleges that MSN was among the search engines that did not retrieve the allegedly unusual search result. Paragraph 11, however, alleges that Inktomi's search engines power the search function of MSN. If this is true, then the inference that plaintiff would draw could be unfounded.

20.  *Id.* ¶ 28.

21.  *Id.* ¶ 46.

22.  *Id.*

23.  *Id.* Att. 8.

24.  *Id.* ¶ 41.

25.  *See* N.Y. CPLR 305(b).

April 25, 2002, purportedly on the ground that the case raised a federal question.[26] The Court, however, remanded the action to the state court on the grounds that (1) the notice endorsed on the summons, which was not accompanied by a complaint, did not sufficiently allege a claim arising under federal law, (2) the notice of removal failed to allege that WIPO and Mason had not been served, and (3) those two defendants did not join in the removal.[27]

Following the remand, plaintiff served a complaint in the state court action which purported to assert claims against AOLTW, Dotster, VeriSign and Inktomi and made clear that he was making a claim a rising under federal law. A OLTW again removed the action, this time effectively, and the case was assigned the present docket number. Plaintiff and AOLTW then entered into a stipulation pursuant to which plaintiff served a first amended complaint which, *inter alia*, dropped WIPO and Mason from the caption and added AOL as a defendant. AOLTW, AOL, Inktomi, and VeriSign then moved to dismiss the first amended complaint.

In an order dated November 25, 2002, the Court granted the motions to dismiss. As it was not entirely clear that plaintiffs could not state a legally sufficient claim against AOL, Inktomi and VeriSign, however, the order provided that "the dismissal [was] without prejudice to the extent, and only to the extent, that plaintiffs ..." may file a second amended complaint (a) setting forth their claim, if any, for a declaratory judgment against AOL, and (b) repleading their Second Claim for Relief against AOL, Inktomi and Verisign, which had alleged that they had "intentionally acted to illegally remove America Online Latino from the Internet."

*The Second Amended Complaint*

Plaintiff essentially ignored the limitation pursuant to which the Court granted leave to replead.[28] The second amended complaint contains six claims for relief, as follows:

- The first is against AOL, alleges that it "wrongfully obtain[ed] [Esposito's] domain name," demands its return, and seeks a declaration that plaintiff is not in violation of the Anticybersquatting Consumer Protection Act ("ACPA").

- The second alleges that VeriSign's Image Café division breached its contract with Esposito by blocking access to his account and web site content for over six months.

- The third alleges that VeriSign breached its agreement for the SureList service by (a) altering the <americaonlinelatino.com> web site search engine placement, and (b) causing users' computers to "crash" when they clicked on <americaonlinelatino.com> while using LookSmart and other unspecified search engines.

- The fourth alleges that Dotster improperly transferred the domain name to AOL following the WIPO decision.

- The fifth alleges that AOL, Dotster, VeriSign and Inktomi conspired to remove plaintiff from the Internet by inducing breaches of contract.

---

**26.** *America Online Latino v. AOL Time Warner, Inc..*

**27.** *America Online Latino v. AOL Time Warner, Inc.,* No. 02 Civ. 3213(LAK), 2002 WL 844343 (S.D.N.Y. May 2, 2002) (order remanding action to New York Supreme Court).

**28.** Despite plaintiff's blatant disregard of the limited basis under which the Court granted leave to replead, the Court considers all of his claims in turn.

• The sixth asserts that defendants conspired "to commit tortious interference with Plaintiffs' [*sic*] prospective economic advantage with the U.S. Latino Internet community." [29]

### Discussion

### AOL

#### The First Claim for Relief

The first claim for relief, which is none too clear, seems to contain two distinct claims—the first a claim that AOL somehow acted improperly in obtaining the disputed domain name and the other for a declaration that Esposito has not violated the ACPA. It is helpful to consider each in turn.

#### 1. The Transfer of the Domain Name

Plaintiff alleges that WIPO proceedings are provided for in the Uniform Domain Name Dispute Resolution Policy ("UDRP"), which was approved by the Internet Corporation for Assigned Names and Numbers ("ICANN") in 1999 and incorporated in his domain name registration agreement with Dotster.[30] Thus, by contracting with Dotster, plaintiff admittedly agreed to arbitrate any claim involving the domain name.[31]

Section 4(k) of the UDRP [32] deals with the effect of the WIPO arbitration panel decision. It provides in relevant part as follows:

"The mandatory administrative proceeding [i.e., arbitration] requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding is concluded. If an Administrative Panel decides that your domain name registration should be canceled or transferred, we will wait ten (10) business days ... after we are informed by the applicable Provider of the Administrative Panel's decision before implementing that decision. We will then implement the decision unless we have received from you during that ten (10) business day period official documentation (such as a copy of a complaint, file-stamped by the clerk of the court) that you have commenced a lawsuit against the complainant in a jurisdiction to which the complainant has submitted under Paragraph 3(b)(xiii) of the Rules of Procedure." [33]

■ The complaint's only suggestion that there was anything wrong with the transfer of the domain name pursuant to the WIPO administrative panel decision, apart from plaintiff's disagreement with the substance of the ruling, is the assertion that the domain name should not have been transferred to AOL because plaintiff sent an e-mail to AOL, WIPO, and Dotster in which he advised them that he had started a lawsuit.[34] But that e-mail, whatever its precise content, plainly did not

---

**29.** Cpt. ¶ 62.

**30.** *Id.* ¶ 31; Dotster Mem. Ex. A, at 2–3.

**31.** *Id.* ¶ 31.

**32.** The UDRP are effectively incorporated by reference in the second amended complaint (*see id.* ¶ 31) and thus appropriately considered on this motion. *E.g., Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000); *Int'l Audio-*

*text Network, Inc. v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995); *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). A copy of the UDRP is Exhibit B to the memorandum in support of Dotster's motion to dismiss.

**33.** Dotster Mem., Ex. B, ¶ 4(k).

**34.** Cpt. ¶¶ 41, 43.

constitute "official documentation (such as a copy of a complaint, file-stamped by the clerk of the court)" that plaintiff had "commenced a lawsuit against the complainant in a jurisdiction to which the complainant has submitted under Paragraph 3(b)(xiii) of the Rules of Procedure."

The complaint attempts to justify plaintiff's failure to provide Dotster with official documentation by asserting that he was unable to obtain a mailing address or telephone number for it.[35] But the attempt is insufficient. To begin with, the fact that plaintiff, who in November 2001 elected to proceed *pro se* in a commercial case, was unable to figure out how to transmit physical copies of official documentation to a corporation, which is an entity created by state law, the contact information for which is a public record, does not alter the fact that Dotster was free under its contract to implement the decision in light of plaintiff's failure. In addition, plaintiff admits that he sent an e-mail to Dotster advising it of the lawsuit. He just as well could have set out the text of his court filing in the e-mail, thus at least coming closer to compliance with the UDRP. Indeed, he could have scanned his court filing, complete with filing stamp or other authenticating indicia, thus creating a digital file containing the image of the court filing, and transmitted that to Dotster by e-mail.[36] Further, plaintiff was free to seek provisional relief against AOLTW and AOL, not to mention to sue Dotster and seek such relief against it. He failed to due so.

In sum, then, plaintiff has failed to allege any facts that, if established, would demonstrate that he is entitled to any relief against AOL for its receipt of the transfer of the domain name by Dotster pursuant to the WIPO administrative panel decision. This aspect of the first claim for relief against AOL is insufficient in law.

### 2. The Declaratory Judgment Claim

There are two principal mechanisms by which disputes concerning domain names are resolved—private arbitration under ICANN's UDRP and litigation, which in the United States typically occurs under the Trademark and Federal Trademark Dilution Acts and, more recently, the ACPA.[37] The remedies available in these *fora* differ, and the standards of liability, while similar, are not identical.[38] As plain-

---

**35.** *Id.* ¶ 42.

Plaintiff's memorandum glides over the requirement that he provide official documentation, suggesting that all that was required was notice of the filing of the lawsuit. Pl. Opp. to Def. America Online, Inc.'s motion 10. This is incorrect.

**36.** The Court has been creating digital files containing images of some court filings (using the widely known and easily available Adobe Acrobat software) and posting them on a web site since at least the second half of 1998. It takes judicial notice of the availability of that technology in the last quarter of 2001.

**37.** Anticybersquatting Consumer Protection Act, Pub. Law No. 106–113, 113 Stat. 1401 § 3002 (1999), *codified in* 15 U.S.C.A. § 1125(d) (West Supp.2002).

*See generally* Lisa M. Sharrock, *The Future of Domain Name Dispute Resolution: Crafting Practical International Legal Solutions From Within the UDRP Framework*, 51 Duke L.J. 817 (2001).

**38.** For example, the only relief available in a UDRP proceeding is cancellation or transfer of a domain name while a successful plaintiff in an ACPA proceeding may obtain also damages and other relief. *Compare* UDRP ¶ 4(i) *with* 15 U.S.C. §§ 1116(a), 1117(a), 1125(d)(1)(A), 1125(d)(1)(C), 1125(d)(2)(D)(ii), 1125(d)(3). In a UDRP proceeding, the complainant must establish that the respondent's domain name is confusingly similar to the complainant's mark, that the respondent has no rights or legitimate interests in the domain name, and that the domain name has been registered and is being used in bad faith.

tiff maintains,[39] these two mechanisms are not mutually exclusive,[40] although the extent to which principles of former adjudication limit this broad statement remains to be worked out.

AOL argues that plaintiff's claim for a declaration that he is not in violation of the ACPA presents no case or controversy and should be dismissed because AOL does not claim that he is.[41] In any case, it argues, his admissions preclude any relief under the ACPA.

Regardless of how it is characterized in his pleading, the point of Esposito's ACPA claim is to obtain the return of the domain name transferred pursuant to the WIPO decision from him to AOL. Putting aside any issue of former adjudication,[42] the ACPA permits the transfer of a domain name "to the owner of the mark."[43] The threshold question therefore is whether the allegations of the complaint preclude Esposito from establishing that he is the owner of any relevant mark. The starting point for this analysis thus is the nature of trademark ownership.

In *Aini v. Sun Taiyang Co. Ltd.*,[44] this Court wrote as follows:

"It is important at the outset to recognize the essential nature of a trademark and the rights it carries and to distinguish them from registration."

"This Court recently has written that:

'A trademark is, essentially, a designation of origin. It serves to inform the public of the source of the goods. As the public comes to know a trademark, it relies on the trademark as a sign that the goods sold under that trademark are of the same quality as goods that it has purchased from that source before. This public association between goods of a certain quality and a trademark benefits the owner of the trademark by making it easy for consumers to find its product and it benefits consumers by allowing them more easily to find goods of a particular producer that have given them satisfaction in the past.' "

'These functions of trademarks have led the law to treat trademarks differently from other species of property. Because the value of a trademark arises from its association with goods of a particular quality and source, a trademark comes into existence only once it is affixed to goods in commerce. Likewise, a trademark cannot be transferred except in connection with a business. Otherwise, the mark would cease to signify the source and quality of the goods to which it once related and the public would be confused or misled by continued use of the trademark. For the same rea-

---

UDRP ¶ 4(a). In order to prevail under the ACPA, the plaintiff must show that the defendant has a bad faith intent to profit from its use of plaintiff's mark and that it has registered, trafficked in or used a domain name that is a protected mark within the meaning of the statute. 15 U.S.C. § 1125(d)(1)(A).

**39.** *See* Cpt. ¶ 34.

**40.** 15 U.S.C. §§ 1125(d)(3), 1125(d)(4); UDRP ¶ 4(k); Kurt Wimmer & Karlyn D. Stanley, *Leading Internet Issues in 2000*, 630 PLI/Pat 189, 284 (2000).

**41.** *See* AOL Mem. 7.

**42.** AOL has raised no such contention on this motion.

**43.** 15 U.S.C. § 1125(d)(1)(C); *see also* 15 U.S.C. § 1125(d)(2)(A) ("owner of a mark" may file *in rem* civil action against domain name); *id.* § 1125(d)(2)(D)(i) (court in *in rem* action may transfer domain name "to the owner of the mark").

**44.** 964 F.Supp. 762 (S.D.N.Y.1997), *aff'd sub nom., Topiclear Beauty v. Sun Taiyang Co., Ltd.*, 159 F.3d 1348 (2d Cir.1998) (table).

sons, although a trademark can be licensed, the licensor must retain some degree of control over the quality of the goods marketed under the trademark by the licensee.' *Liebowitz v. Elsevier Science Ltd.*, 927 F.Supp. 688, 695–96 (S.D.N.Y.1996) (citations omitted).

"One therefore may not 'own' a trademark unless one uses the mark as a designation of origin on or in connection with goods or services made or furnished by or under one's control. *Id.* Ownership, moreover, is a product of use, not of registration. 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ... § 19:3 (4th ed.1996); *see San Juan Products, Inc. v. San Juan Pools, Inc.*, 849 F.2d 468, 474 (10th Cir.1988).' " [45]

Ownership, moreover, depends not only on use as a designation of origin. As Professor McCarthy has written, "[o]wnership rights flow only from *prior* use...." [46] Or, as the Restatement, puts it:

"One who has used a designation as a trademark ... has priority in the use of the designation over another user ... in any geographic area in which the actor has used the designation in good faith or in which the designation has become associated with the actor as a result of good faith use before the designation is used in good faith by, or becomes associated with, the other...." [47]

The complaint alleges that America Online is the world's largest ISP,[48] that it has been in business for over ten years,[49] and that it has registered "many, many domain names in that time, including many domain names which include the words 'America' and 'online.' " [50] Further, the Court, on request of AOL and without objection from plaintiff, takes judicial notice of AOL's many domain names including the words "America online." [51] Plaintiff, on the other hand, asserts that he registered his domain name in 2000 with plans to commence his business. He therefore cannot establish priority of use of a mark including "America Online." Indeed, the complaint specifically admits that "Mr. Esposito had no legal trademark or other intellectual property rights since his company was only formed in March 2000...." [52]

■ In view of plaintiff's admission that he owned no trademark, and as he indisputably was not the senior user, he cannot state a claim for relief under the ACPA.[53]

**45.** *Id.* at 773.

**46.** 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:18 (4th ed.2002) (emphasis added).

**47.** RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 19 (1995).

**48.** Cpt. ¶ 3.

**49.** *Id.* ¶ 33(C).

**50.** *Id.*

**51.** AOL Mem. 3 & n. 4; Arlen Decl., Nov. 6, 2002, Ex. 8. The Court does not consider the Arlen declaration generally and does not convert the motion into one for summary judgment under FED. R. CIV. P. 12(b). It merely takes judicial notice of the domain names listed in the cited exhibit.

**52.** Cpt. ¶ 33(C).

**53.** In view of Esposito's admission that he owned no trademark, it is unnecessary to determine whether he owned a trademark in "americaonlinelatino" as distinct from "americaonline." Were the question presented, however, it would be quite straightforward. As Esposito has conceded AOL's priority of use of "americaonline" and "America Online," the only question is whether appending "latino" to "americaonline" could give him rightful priority of use of that term. Putting aside, for the moment, any question of bad faith, the addition of a generic term describing a category of consumers to the trademark

Accordingly, this Court cannot order the transfer of the domain name to him or declare that he is entitled to it under that statute, regardless of whether Esposito adopted it in good faith. Nor is there any other live controversy in respect of which a declaration of rights would be appropriate. Accordingly, the first claim for relief must be dismissed.

### The Conspiracy Claims

The essence of the fifth cause of action is that the defendants conspired to interfere with his contracts with Dotster for domain registration, with VeriSign for web site hosting and search engine services, and with Inktomi for search engine services.[54] The sixth alleges a conspiracy among the defendants to interfere with plaintiff's prospective economic relationship with the Latino Internet community.[55]

■ Under New York law,[56] "there is no separate tort of conspiracy, [although] allegations of conspiracy are permitted 'to connect the actions of separate defendants with an otherwise actionable tort.' "[57] Thus, the fifth and sixth claims may not stand unless they adequately allege the commission of actionable torts. The issue of the sufficiency of the conspiracy allegations is material only if, and to the extent, that these claims do so.

### 1. Tortious Interference With Contract

■ In order to state a claim for tortious interference with contract, the plaintiff must allege (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach without justification, (4) breach, and (5) damages.[58]

The alleged conspiracy to interfere tortiously with plaintiff's contract with Dotster fails. Dotster's breach is said to have consisted of its transferring the domain name to AOL pursuant to the WIPO decision, which allegedly violated the registration agreement with plaintiff and the UDRP because plaintiff had given notice of the commencement of this lawsuit in the state court.[59] As indicated above, however, neither the registration agreement nor the UDRP prohibited its action in the absence of its receipt of "official documenta-

---

of a well known provider of services in the same business cannot possibly confer a rightful priority because it so obviously would cause confusion as to source. The mark's clear meaning is that the service marketed under "americaonlinelatino" is service provided by AOL to Latino consumers, which was a patently false suggestion. In any case, plaintiff's admissions that AOL for years has been offering Internet services under domain names including the words "America" and "online" and that it is the world's largest ISP is a virtual admission of bad faith.

**54.** Cpt. ¶¶ 44–48, 60.

The complaint fails to allege, however, that plaintiff entered into any contract with Inktomi. *See infra* note 65.

**55.** *Id.* ¶¶ 49, 62.

**56.** The law of the forum state governs where, as here, there is no suggestion that the differing law of another jurisdiction controls. *Ward v. Nat'l Geographic Soc'y*, 208 F.Supp.2d 429, 438 n. 46 (S.D.N.Y.2002); *Questrom v. Federated Dep't Stores*, 192 F.R.D. 128, 133 & n. 26 (S.D.N.Y.2000), *aff'd*, 2 Fed.Appx. 81 (2d Cir.2001).

**57.** *Am. Baptist Churches of Metro. New York v. Galloway*, 271 A.D.2d 92, 101, 710 N.Y.S.2d 12, 18 (1st Dept.2000) (quoting *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 547, 503 N.E.2d 102 (1986)).

**58.** *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 81–82, 668 N.E.2d 1370 (1996).

**59.** Cpt. ¶ 58.

tion," which plaintiff failed to provide prior to the transfer. Hence, there was no breach of contract by Dotster.

The claim premised on alleged breaches by VeriSign stands differently. The complaint alleges that VeriSign breached its hosting and web site administration contract by blocking plaintiff from accessing its account and web site content and its SureList search engine placement agreement by removing <americaonlinelatino.com> from "the number one search engine position and placing it on a custom search page."[60] Plaintiff apparently regards VeriSign's alleged failure to avoid the alleged "crashing" of users' computers described above as a further breach.[61] The Court considers the underlying contracts in ruling on AOL's motion to dismiss.[62] The Web Site Licensing Agreement, although it contains an integration clause, does not spell out the nature of the ser-

vices to be provided.[63] The Service Agreement likewise contains an integration clause but fails to define the services to be provided.[64] It therefore is impossible at this stage to exclude the possibility that plaintiff might establish a breach by VeriSign of either or both of these contracts. In consequence, it is necessary to consider the sufficiency of the conspiracy allegation.

■ The fifth claim for relief alleges that AOL conspired with the other defendants to interfere with plaintiff's contracts with VeriSign.[65] The only factual support offered in the pleading is the allegation that AOL had a motive to get plaintiff off the Internet and that the problems plaintiff encountered with VeriSign could not have been accidents. Assuming *arguendo* that these circumstances might justify an allegation that AOL interfered with the Esposito–VeriSign contracts, they do not rationally support any suggestion that

60. *Id.* ¶¶ 54, 56.

61. *Id.* ¶ 56.

62. *E.g., Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).
In support of his claims, plaintiff attached two model VeriSign agreements to the complaint, but admitted that he did not possess the actual contracts. Cpt. ¶¶ 10–11 & n. 2 & 4. VeriSign clarified in its Memorandum of Law in Support of its Motion to Dismiss that the Web Site Licensing Agreement plaintiff attached to the complaint is a copy of the agreement to which he assented. VeriSign Mem. 3; Cpt. Att. 2. Furthermore, VeriSign provided a copy of the Service Agreement used in July 2001 when plaintiff allegedly subscribed for SureList services. VeriSign Mem. 7; Hornak Decl. Ex. G. According to VeriSign, the relevant terms of that contract mirror the terms of the service agreement plaintiff attached to the complaint. VeriSign Mem. 7.

63. Cpt. Att. 2, ¶ 1.

64. Hornak Decl. Ex. G, ¶ 22.

65. There is no need to discuss the sufficiency of the conspiracy allegation with respect to

the alleged interference with the Dotster contract, as the complaint alleges no breach thereof. *See supra* text accompanying note 59.

The complaint refers also to alleged interference with a contract to which Inktomi was a party. Plaintiff, however, alleges no contract between himself and Inktomi. He appears to allege tortious interference with a contract between VeriSign and Inktomi. *See* Cpt. ¶ 47. Attached to the complaint is a copy of a Distribution Agreement between Inktomi and Network Solutions, Inc. ("NSI"), which VeriSign allegedly acquired in 2001, describing the indexing service Inktomi would provide to NSI clients. *Id.* Att. 4. Plaintiff may not sue for inducing breach of such a contract unless he is its third party beneficiary. But it is unnecessary to consider whether he is a third party beneficiary, as the complaint fails to allege any respect in which Inktomi or VeriSign breached any agreement between them. Moreover, the pleading provides no factual support for the argument that AOL and Dotster conspired to interfere with any Inktomi–VeriSign contract.

Dotster or Inktomi either interfered or agreed to do so. A conspiracy, moreover, requires a plurality of actors. There is no reasonable basis for the allegation that AOL conspired with Dotster and Inktomi to interfere with plaintiff's VeriSign agreements. The conspiracy allegation, insofar as it relates to the VeriSign contracts, thus is entirely conclusory and must be dismissed.[66]

### 2. Tortious Interference With Prospective Economic Advantage

■ In order to state a legally sufficient claim for tortious interference with prospective economic advantage, a plaintiff must allege "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship."[67] "Wrongful means include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions, and some degree of economic pressure."[68]

■ In view of what has been said already, the only even arguably improper means by which plaintiff's nascent relationship with the Latino Internet community was injured was the breach or breaches of contract, if there were any, by VeriSign. If AOL brought improper pressure to bear on VeriSign and thus procured VeriSign's cooperation in a scheme to interfere with plaintiff's operation, the necessary concerted action may have occurred.[69]

---

66. *See, e.g., Ciambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir.2002).

67. *Nadel v. Play–by–Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000).

In a recent decision on this point, the Court of Appeals described the third prong of the test as requiring, as one alternative, a wrongful purpose as opposed to a sole purpose of harming the plaintiff, citing principally *Burba v. Rochester Gas & Elec. Corp.,* 139 A.D.2d 939, 528 N.Y.S.2d 241 (4th Dept.1988) and *Nadel. Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir.2002). The majority in *Burba,* however, did not articulate the elements of a claim for tortious interference with prospective business relations, while the dissenters stated that the third prong may be satisfied by a showing that the defendant acted with the sole purpose to harm the plaintiff. 139 A.D.2d at 940, 528 N.Y.S.2d at 242–43. Furthermore, the *Nadel* court articulated the "sole purpose" standard, not the "wrongful purpose" test. 208 F.3d at 382. In consequence, there is no reason to believe that *Lombard's* formulation reflects any change in the long established law.

68. *Lombard,* 280 F.3d at 214–15; *accord Riisna v. Brennan,* No. 01 Civ. 2698(LAK), 2001 WL 987478, at *1 (S.D.N.Y. Aug. 23, 2001) (citing *Snyder v. Sony Music Ent. Inc.,* 252 A.D.2d 294, 300, 684 N.Y.S.2d 235, 239 (1st Dept.1999)); *Protic v. Dengler,* 46 F.Supp.2d 277, 279 (S.D.N.Y.), *aff'd,* 205 F.3d 1324 (2d Cir.1999) (table).

69. Even reluctant acquiescence secured by threats is sufficient to form a conspiracy between the entity making the threat and one which is coerced into compliance. *E.g., Albrecht v. Herald Co.,* 390 U.S. 145, 149, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (conspiracy to fix resale prices formed by acquiescence of retailers in prices suggested by manufacturer secured by threats of termination), *overruled on other grounds by, State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

It should be noted that this conclusion is not inconsistent with that concerning the fifth claim for relief. The object of the conspiracy there alleged was the procurement of the breach by VeriSign of its contracts with plaintiff. While VeriSign was capable of agreeing with AOL to commit a breach, it was incapable of agreement with AOL to *procure* a breach by itself. *See, e.g., Burnett v. Unisys Corp.,* No. 89–CV–923, 1989 WL 135561, at *3 (W.D.N.Y.1989) (party cannot tortiously interfere with contract to which it is a party); *Sharma v. Skaarup Ship Mgmt. Corp.,* 699 F.Supp. 440, 445 (S.D.N.Y.1988), *aff'd,* 916 F.2d 820 (2d Cir.1990). Thus, unlike the sixth

As the Court may not dismiss a claim unless it is clear that plaintiff could prove no facts under its allegations which would entitle him to relief,[70] AOL's motion to dismiss the sixth claim for relief must be denied.

### Dotster

The fourth claim for relief alleges that Dotster breached its agreement with plaintiff and the UDRP by transferring the domain name to AOL pursuant to the WIPO decision notwithstanding plaintiff's e-mail notice that he had filed a summons in the New York Supreme Court.[71] It is named also on the fifth and sixth claims for relief.

The contract claim against Dotster is manifestly insufficient for the reason described above-in the absence of receipt of "official documentation," Dotster was free under its contract and perhaps even obliged by the UDRP to transfer the domain name. The fifth claim for relief is insufficient as to Dotster for the same reasons that it fails as to AOL. In consequence, the only issue requiring further comment is the sufficiency of the sixth claim as to Dotster.

As previously indicated, purely conclusory allegations of conspiracy to engage in tortious behavior are insufficient. While the complaint arguably suggests a motive for AOL to have interfered with plaintiff's efforts to market to the Latino community, it certainly suggests no such motive for

Dotster. Nor is there anything to suggest that Dotster had anything to do with, let alone any interest in, whatever may have transpired between plaintiff and VeriSign.

Accordingly, Dotster's motion to dismiss the complaint will be granted.[72]

### Inktomi

Inktomi is named only on the conspiracy counts. Plaintiff alleges no facts from which one reasonably might infer that Inktomi had any motive to conspire against plaintiff, let alone that it did so. Indeed, he fails to allege that Inktomi even knew of his contracts with VeriSign. Accordingly, Inktomi's motion to dismiss will be granted.

### VeriSign

VeriSign is named in two breach of contract counts as well as the two conspiracy claims.

As the foregoing discussion demonstrates, the Court cannot exclude the possibility that plaintiff might prove facts under this pleading that would give him a right to some relief for breach of contract by VeriSign.[73] The fifth claim for relief, which arguably alleges the elements of tortious interference only with the VeriSign contracts, cannot stand because the conspiracy allegations are insufficient and, in any case, VeriSign cannot be sued for conspiring to procure, or procuring, its own breach of contract.[74] And the discussion of AOL's motion, insofar as it was directed to the sixth claim for relief, dem-

---

claim, the fifth does not support the necessary agreement to achieve the object of the alleged conspiracy.

**70.** *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**71.** Cpt. ¶ 58.

**72.** As indicated previously, the Court does not consider the substance of Dotster's moving affidavit in ruling on this motion. It does not

convert the motion into one for summary judgment.

**73.** To the extent that plaintiff seeks to recover more than the amount paid for services under the Website Licensing and the Service Agreements, the claims are dismissed because they are barred by the respective agreements. Cpt. Att. 2 ¶¶ 8–9; Hornak Decl. Ex. G, ¶ 13.

**74.** *See supra* note 69.

onstrates why that claim may not be dismissed as to VeriSign at this stage.[75]

VeriSign asserts also that venue is improperly laid in this district because the SureList Service Agreement to which plaintiff assented provided for exclusive jurisdiction in courts in Virginia in suits of this character.[76] Plaintiff does not deny that this case comes within that exclusive jurisdiction agreement but nevertheless argues that the Court should not enforce the clause in the interest of judicial economy and because the provision was only in the "fine print" and was not negotiated between the parties.[77] Neither of these arguments is persuasive.[78]

### Conclusion

For the foregoing reasons, the motions of Dotster and Inktomi to dismiss the second amended complaint are granted in all respects. The motion of AOL to dismiss the second amended complaint is granted to the extent that the first and fifth claims for relief are dismissed as to AOL and otherwise denied. The motion of VeriSign to dismiss the complaint is granted to the extent that (a)(i) so much of the second and third claims for relief as seek to recover more than the amount plaintiff paid for services thereunder and (ii) the fifth claim for relief are dismissed as to VeriSign, (b) the third claim (subject to the limitation in (a)(1)) and sixth claim for relief are severed from this action and transferred to the United States District Court for the Eastern District of Virginia, and (c) otherwise denied.[79] Insofar as the action is brought in the name of America Online Latino, it is dismissed for lack of capacity to sue.

In view of the fact that plaintiff already has filed three complaints, has ignored without adverse consequences the limits placed on the scope of the second amended complaint, and shows no likelihood of curing any of the deficiencies that resulted in the aspects of this decision adverse to him, leave to replead is denied.

In light of the fact that part of the action will remain here and part will be transferred, the Clerk shall make a duplicate copy of the record and send it to the Clerk of the Eastern District of Virginia while retaining the original record here.

SO ORDERED.

---

**75.** In passing on VeriSign's motion to dismiss for legal insufficiency, the Court does not consider the declaration it has submitted.

**76.** Hornak Decl. ¶ 16 & Ex. G, ¶ 24.

**77.** Pl. Opp. to VeriSign motion 6.

**78.** *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (forum selection clause must be upheld unless "enforcement would be unreasonable and unjust, or ... clause [is] invalid for such reasons as fraud or overreaching"); *Bear,* *Stearns & Co., Inc. v. Bennett*, 938 F.2d 31, 31 (2d Cir.1991) (enforcing forum selection clause); *Strategic Mktg. & Communications, Inc. v. Kmart Corp.*, 41 F.Supp.2d 268, 272 (S.D.N.Y.1998) ("A forum selection clause can bind contracting parties even when the contract in questions is a form contract and not subject to negotiation.")

**79.** So much of VeriSign's motion as seeks dismissal on the ground that the agreement for SureList services provided for exclusive jurisdiction in courts in Virginia (VeriSign Mem. 9 *et seq.*) is denied.